*In re* SALMONELLA LITIGATION

First District (2nd Division)   No. 1—88—0983

Opinion filed May 8, 1990.—Rehearing denied June 19, 1990.

William J. Harte, Ltd., and Lawrence W. Leck & Associates, Ltd., both of Chicago (William J. Harte and Lawrence W. Leck, of counsel), for appellants.

Skadden, Arps, Slate, Meagher & Flom and Phelan, Pope & John, Ltd., both of Chicago (Sheila L. Birnbaum, Gary E. Crawford, David E. Springer, James F. Martin, Richard J. Phelan, Richard A. Devine, Mary K. Rochford, and Sandra D. Oliszewicz, of counsel), for appellee.

PRESIDING JUSTICE DiVITO delivered the opinion of the court:

This is a consolidated class action suit brought by persons seeking damages due to the March 1985 outbreak of Salmonellosis traced to milk produced by defendant Jewel Companies, Inc., at its Hillfarm Dairy in Melrose Park, Illinois. Jewel Companies, Inc., and its owner, defendant American Stores, Inc. (collectively Jewel), conceded liability for compensatory damages under a theory of strict liability in tort. The issue of Jewel's liability for punitive damages was then tried before a jury. After hearing evidence for nearly three months, the jury returned a verdict in favor of Jewel, finding specifically that Jewel had not engaged in willful and wanton conduct. Plaintiffs appealed, raising as issues (1) whether the jury verdict in favor of Jewel is against the manifest weight of the evidence and (2) whether the jury verdict must be overturned because of prejudicial and inflammatory

remarks made during defense counsel's closing argument. We affirm.

The evidence adduced at trial established that production of milk at the Hillfarm Dairy met or exceeded the requirements of the Grade A Pasteurized Milk and Milk Products Act (PMO) (Ill. Rev. Stat. 1987, ch. 56½, pars. 2201 through 2219), which sets forth standards for cleanliness and sanitization procedures. The Hillfarm Dairy used a "closed system" of stainless steel pipes to protect milk products from contamination. The Food and Drug Administration's report on the 1985 Salmonella outbreak described the Hillfarm Dairy as "state of the art" and "one of the most modern and sophisticated in the United States." Harold Waines, an expert in dairy bacteriology, dairy design, and food processing sanitation, testified that the Hillfarm Dairy was "one of the best plants in the United States."

The Hillfarm Dairy produced "Hillfarm" and "Bluebrook" milk. Both brands were produced from the same "raw" milk under the same pasteurization process, but the Hillfarm brand contained added milk solids. Each brand was produced during different production "runs" and stored in different pasteurized storage tanks. The packaged milk was coded with a "pull date" of nine days after the date of production. Retailers were not permitted to sell milk after the pull date.

Raw milk entering the Hillfarm Dairy underwent "thermoduric" tests to determine whether it contained any organisms that could survive the pasteurization process, and "psychrotrophic" tests to determine whether it contained organisms that could grow at low temperatures. Milk that passed these initial tests was stored in stainless steel milk silos at low temperatures to retard the growth of bacteria. The milk then passed from the storage silos to the pasteurizers.

The pasteurization process at the Hillfarm Dairy consisted of heating "raw" milk to a high temperature, holding the milk at that temperature, and then cooling and storing the milk to retard the growth of any remaining bacteria. The process killed harmful bacteria, including the Salmonella bacterium and, specifically, *Salmonella typhimirium*, the Salmonella serotype involved in the 1985 outbreak. The pasteurization process at the Hillfarm Dairy heated the raw milk to temperatures exceeding the minimum required by law and cooled the milk to temperatures below the required maximum. The Hillfarm Dairy maintained pasteurization and storage temperature records which indicated that the pasteurization process was functioning properly during the production of milk that caused the 1985 Salmonella outbreak.

After pasteurization, the milk was stored in a pasteurized milk

tank. Tests were performed on samples taken from the storage tank, including a test for the presence of coliform, a nonpathogenic organism. The coliform test was used in the dairy industry as a test for post-pasteurization contamination. The Illinois Department of Public Health (IDPH) considered the coliform test a reliable check for post-pasteurization contamination by Salmonella and other organisms. The PMO did not require testing for Salmonella, nor was such testing recommended by the IDPH or other regulatory agencies. The records at the Hillfarm Dairy showed normal testing results during the production of the milk that was linked to the Salmonella outbreak.

The Hillfarm Dairy operated five days per week. The dairy was "down" on Sundays and Tuesdays for maintenance purposes. At the end of each day's production, the entire system of pipes, pasteurization tanks, and various valves was cleaned and sanitized with a "clean-in-place" system. This system pumped a hot water rinse solution, a wash solution containing iodine or chlorine, both of which kill Salmonella bacteria, and a final rinse solution through the entire system of pipes, tanks, and valves. The clean-in-place system records at the Hillfarm Dairy showed that the sanitization system was functioning properly during the production of milk that caused the 1985 Salmonella outbreak.

In August 1984, a higher than normal incidence of Salmonellosis cases was reported to the IDPH. The IDPH conducted a study and found that the reported illnesses were linked to persons who had shopped at Jewel. No specific product was implicated, just dairy products generally.

Jewel hired Silliker Laboratories, Inc. (Silliker), to investigate the source of the outbreak. Silliker tested product samples covering one week. No Salmonella was found in the production process or in the production area of the Hillfarm Dairy. The only Salmonella found in the plant was on a drip pan under a conveyor belt used to transport used milk crates. That strain of Salmonella, however, was different form the strain involved in the reported cases.

The IDPH performed its own tests in September 1984 and found that all dairy equipment was functioning properly. The IDPH did not recommend Salmonella testing because the coliform tests did not indicate any post-pasteurization contamination.

The Food and Drug Administration investigated the Hillfarm Dairy in September 1984, found nothing indicating that the production process at the Hillfarm Dairy caused the Salmonella outbreak, and found no evidence linking the Hillfarm Dairy's products to the reported Salmonella cases.

On the morning of March 29, 1985, IDPH received reports of an increase in the number of Salmonellosis cases in the Chicago area. That same morning, Dr. Steven Potsic, executive director of the Lake County Health Department (LCHD), learned that Lake County had nine "culture-confirmed" cases of Salmonellosis. Because food consumption patterns suggested a possible link to milk sold at Jewel stores, the LCHD contacted several Jewel stores to determine whether the contamination might be due to refrigeration or other in-store problems. No such problems were found, and at about 4 p.m. that afternoon, Potsic telephoned Carl Langkop, Administrator of the IDPH Communicable Disease Control Program in Springfield, Illinois. Langkop told Potsic that the IDPH had already contacted Jewel. According to Potsic, he suggested to Lankop that Jewel close its dairy. According to Langkop, however, Potsic suggested only that Jewel withdraw a certain milk product.

Langkop telephoned Dr. Robert Flentge, chief of the governing Food, Drug, and Dairy Division of the IDPH. Flentge indicated that he disagreed with Potsic and thought the evidence was too weak to either withhold milk or close the dairy. Dr. Byron Francis, Associate Director of the IDPH Office of Health Protection, disagreed with Flentge and thought the Bluebrook milk should be withdrawn.

That afternoon, Paul McDonnell, Supervisor of the IDPH west Chicago office, telephoned Lawrence Gambill, Jewel's head of quality assurance, and Michael McClory, Jewel's director of quality control manufacturing. McDonnell told both Gambill and McClory that some of the people who tested positive for Salmonella claimed to have consumed Bluebrook 2% milk. McClory telephoned Dr. Russell Flowers, Silliker Laboratories' director and vice-president, and asked him to speak to the IDPH and to immediately begin testing samples. Both the IDPH and Silliker gathered product samples that night and began testing the following morning.

Between 3 and 5 p.m. on March 29, 1985, plant manager Bill Fisher checked the clean-in-place records, the pasteurization records, and the post-pasteurization cooling charts for Bluebrook 2% milk produced on March 20, 1985, and code-dated March 29, 1985. The records showed that the clean-in-place runs had been normal, that all products produced on March 20, 1985, had been properly pasteurized, and that the products had been stored at the required temperatures. Fisher also checked the coliform test results and found that the coliform counts indicated no post-pasteurization contamination.

At about 5 p.m., Ted Byers of the Lake County Health Department told McClory that a number of confirmed Salmonella cases had

been found. Byers did not believe the evidence was sufficient to withdraw milk, but asked McClory whether Jewel had a computer link-up with its stores in the event that the LCHD unilaterally decided to pull milk from the stores. According to Byers, McClory stated that he thought there was insufficient evidence to withdraw milk and that there would be legal action if the LCHD tried to withdraw milk from the stores.

That evening, McClory called Robert Neslund, Jewel's vice-president of marketing and told him about the Salmonella outbreak. Neslund telephoned David Clarke, Jewel's vice-president of merchandising, and told him to stand by for a possible recall of milk. Neslund also called Al Kara, Jewel's vice-president of manufacturing, and apprised him of the situation.

On Saturday, March 30, 1985, Kara called Jim Henson, Jewel's president, and told him that Bluebrook 2% milk produced on March 20 and code-dated March 29 was the suspected cause of the Salmonella outbreak. Kara told Henson that the IDPH and the Center For Disease Control had begun an investigation. Kara also told Henson that the production records showed that the milk produced on March 20 had been properly pasteurized. Henson told Kara to make certain that all Jewel employees understood they were to cooperate fully with everyone who needed information.

At 8 a.m. on Monday, April 1, 1985, Henson met with Jewel's executive committee and reported that the IDPH had begun an investigation, that the Center For Disease Control (CDC) and the Food and Drug Administration (FDA) had been notified, and that Silliker was testing samples of Bluebrook 2% milk. Henson told Kara to keep him fully informed, to contact him at any time, and, at a minimum, to confer with him daily.

That same morning, Henson met with several persons, including Kara, McClory, and Fisher. They discussed the subjects of recalling products and closing the Hillfarm Dairy. Everyone present believed at that time that the only suspected product was Bluebrook 2% milk produced on March 20 and code-dated March 29. Henson concluded that the available information did not require any additional action.

By mid-day on Monday, April 1, the CDC completed its study which showed, for the first time, a statistical link between the reported Salmonella cases and Bluebrook 2% milk produced on March 20 and code-dated March 29. Jewel immediately implemented a complete recall of that product. Jewel issued a press release asking its customers to return all cartons of Bluebrook 2% milk code-dated March 29. Jewel also sent recall notices to all stores, even though the

milk code-dated March 29 was already off the store shelves.

At 2 p.m. that day, the IDPH stated during a press conference that the Bluebrook 2% milk code-dated March 29 was being recalled and that the problem was limited to that product. The IDPH issued a press release which stated that its investigation showed "no association with other types of milk" produced at the Hillfarm Dairy. The IDPH also told Jewel personnel that there was no need to close the Hillfarm Dairy.

Tuesday, April 2, 1985, was a regularly scheduled "down" day at the Hillfarm Dairy. Representatives of various Federal and State regulatory agencies arrived that day to inspect the Hillfarm Dairy.

On the morning of April 3, 1985, Charles Price of the FDA stated that he believed a "skim milk transfer line" in the Hillfarm Dairy violated the PMO. The transfer line sent pasteurized skim milk to the frozen dessert system and to the raw milk storage tanks at the end of each production day. Price requested that the line be disconnected, and Jewel immediately complied.

The skim milk transfer line was never identified as the cause of the Salmonella contamination. A task force formed by the IDPH did not identify the transfer line as the cause of the contamination in its final report. Harold Wainess, one of Jewel's expert witnesses, testified that in his opinion the transfer line did not violate the PMO and did not provide an opportunity for raw milk to mix with pasteurized milk. Evidence was also presented at trial that certain Hillfarm milk produced after the transfer line had been disconnected was contaminated with Salmonella.

Late in the morning on April 3, 1985, Jewel learned that IDPH tests showed that Bluebrook 2% milk produced on March 20 and code-dated March 29 was presumptively positive for Salmonella. Jewel also learned that 151 containers of Bluebrook 2% milk code-dated March 30 and March 31 tested negative for Salmonella.

Later that afternoon, Henson called a meeting to discuss the possibility of closing the Hillfarm Dairy. Kara reported that the regulatory officials were not recommending that Jewel close the Hillfarm Dairy. Henson then called McClory, who was in his office at the Hillfarm Dairy with McDonnell of the IDPH. Henson asked if the Hillfarm Dairy should be closed and heard McDonnell respond that it was "not necessary to close the dairy at this time." Based on this information, Henson decided not to close the Hillfarm Dairy.

At 2 p.m. on April 3, the IDPH issued a press release which stated that "the contaminated product is limited to just the Bluebrook brand 2% milk in one-gallon containers dated 3/29/85." The IDPH

also commended Jewel for its cooperation with health officials.

On April 4, 1985, the IDPH confirmed its earlier test results that Bluebrook 2% milk code-dated March 29 was contaminated with Salmonella. Further testing by Silliker and the government agencies continued to show that no other product was involved.

On April 5, 1985, Silliker also confirmed that Bluebrook 2% milk code-dated March 29 was contaminated. Silliker then reported that it had tested samples of Bluebrook 2% milk produced from March 21 through March 29 with negative results for Salmonella. The IDPH reported that its tests of Bluebrook 2% milk code-dated March 24 through March 28 and March 30 through April 4 were all negative for Salmonella.

That same day, the FDA showed Jewel its preliminary investigation findings. The FDA believed that the transfer line might have caused the contamination, but did not conclude positively that it had. Henson read the FDA report and asked Kara and McClory whether the report raised any concerns about closing the Hillfarm Dairy. Kara and McClory told Henson that McDonnell of the IDPH continued to advise them not to close the Hillfarm Dairy.

On April 8, 1985, the IDPH reported that the number of reported Salmonellosis cases had increased since April 5, but that the number of new cases was decreasing. The IDPH attributed the increase primarily to the fact that local health departments had been closed from April 5 through April 7 because of the holidays.

April 9, 1985, was a regularly scheduled "down" day at the Hillfarm Dairy. Henson heard radio reports that morning that Hillfarm 2% milk code-dated April 8 might be contaminated with Salmonella. He confirmed the reports with the dairy and, at about 8:30 a.m., met with several senior Jewel personnel. Henson announced at the meeting that he had decided to close the Hillfarm Dairy. His decision was not based on any action by the IDPH. Those present at the meeting also decided that Jewel would immediately withdraw and recall all fluid milk products. Later that day, Henson decided to withdraw and recall all products made at the Hillfarm Dairy and every item made using Hillfarm Dairy products.

The IDPH report on April 9 stated that the source of the Salmonella contamination was still unknown. Charles Price of the FDA testified that on April 9 there was still insufficient evidence to close the Hillfarm Dairy.

Beginning April 1, 1985, Jewel received consumer complaints about products other than Bluebrook 2% milk code-dated March 29. Kara and McClory told Henson that the IDPH and the CDC had

warned that customer complaints about other products should be expected because of consumer confusion and "secondary infection." Dr. Daniel Roth, one of Jewel's expert witnesses, testified that the complaints did not provide evidence that another product might be contaminated. He testified that false reporting of the identity of contaminated products is a well-known phenomenon among epidemiologists.

On April 19, 1985, the IDPH formed a task force to investigate the cause of the Salmonella outbreak. The task force included representatives of the IDPH, the FDA, the CDC, Jewel, and independent experts. The task force issued a final report on September 13, 1985, which concluded that there were two outbreaks of Salmonellosis in the spring of 1985, the first associated with Bluebrook 2% milk produced on March 20 and the second associated with Hillfarm 2% milk produced on March 30. The report indicated that the task force had investigated several possible sources of the contamination, including the possibility of heavily contaminated raw milk deliveries, a heat-resistant Salmonella that survived pasteurization, and defects in the plant such as the skim milk transfer line, but was unable to determine the source of the contamination.

## I

Plaintiffs maintain first that the jury verdict in favor of Jewel is against the manifest weight of the evidence. Plaintiffs argue that the evidence showed that Jewel continued to market its milk products even though it did not know the source of the Salmonella contamination; failed to obtain test results for milk produced after March 29, 1985, even though finished product testing was necessary because Bluebrook and Hillfarm milk shared raw milk sources and pasteurization tanks; ignored consumer complaints that put Jewel on notice that other products were contaminated; and failed to withhold such products or warn the public of the dangers of such products. This evidence, plaintiffs maintain, conclusively established willful and wanton conduct on Jewel's part. We disagree.

■■ ■ Punitive damages may be awarded where torts are committed "with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others." (*Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 186, 384 N.E.2d 353.) To establish willful and wanton conduct, a plaintiff must prove the defendant's intent to inflict injury or a "callous disregard for whether injury will occur." (*Del Muro v. Commonwealth Edison Co.* (1984), 124 Ill. App.

3d 473, 481, 464 N.E.2d 772.) Whether the defendant's conduct rises to the level of willful and wanton conduct is generally a question of fact for the jury. (*Bresland v. Ideal Roller & Graphics Co.* (1986), 150 Ill. App. 3d 445, 451, 501 N.E.2d 830.) A jury's refusal to award punitive damages will be set aside as against the manifest weight of the evidence only if the verdict is arbitrary, unreasonable, and not based on the evidence. (*Martin v. Zucker* (1985), 133 Ill. App. 3d 982, 990-91, 479 NE.2d 1000.) The verdict will not be set aside if credible evidence fairly tends to support it. *Tedrowe v. Burlington Northern, Inc.* (1987), 158 Ill. App. 3d 438, 444, 511 N.E.2d 798.

■■ In this case, there is ample support in the record for the jury's verdict in favor of Jewel. When Jewel first learned that there was a statistical correlation between the reported Salmonellosis cases and its Bluebrook 2% milk, it immediately withdrew that product, began to investigate the source of the contamination, and hired a private laboratory to inspect the Hillfarm Dairy and test product samples. In addition, three government regulatory agencies, the IDPH, the CDC, and the FDA, became involved in the investigation.

The jury heard evidence that Jewel employees cooperated fully with the investigations conducted by the government agencies; that Jewel was commended for its efforts by the IDPH; that Jewel immediately disconnected a skim milk transfer line when it was suspected by the FDA to be the cause of the contamination; that no government agency ever recommended that Jewel close the Hillfarm Dairy; and that on April 9, Jewel voluntarily closed the Hillfarm Dairy when it learned, for the first time, the Hillfarm 2% milk produced on March 30 might be contaminated.

The jury also heard evidence that until April 9, 1985, the only product known by Jewel's employees to be contaminated with Salmonella was Bluebrook 2% milk produced on March 20 and code-dated March 29. On April 1, the IDPH issued a press release which stated that its investigation showed "no association with other types of milk." On April 3, Jewel learned that 151 samples of Bluebrook 2% milk code-dated March 30 and March 31 tested negative for Salmonella. That same day, the IDPH issued another press release which stated that "the contaminated product is limited to just the Bluebrook brand 2% milk in one-gallon containers dated 3/29/85."

On April 4 and 5, Silliker Laboratories reported that samples of Bluebrook 2% milk produced from March 21 through March 29 tested negative for Salmonella. On April 5, the IDPH reported that samples of Bluebrook 2% milk code-dated March 24 through March 28 and March 30 through April 4 all tested negative for Salmonella. Evidence

that test results for samples produced on March 30 should have been available by April 2 is hardly evidence of willful and wanton conduct on Jewel's part, given Henson's testimony that if the results had been available he would have known of them. Even if the test results had been available on April 2, Jewel would not have known that Hillfarm 2% milk was contaminated because the test results were all negative for Salmonella.

Finally, the jury heard evidence that the pasteurization process at the Hillfarm Dairy was working properly and that following each production run, the entire system of tanks, pipes, and valves was flushed with a disinfecting solution which killed Salmonella bacteria. Thus, even though elements of the pasteurization system were shared by the Bluebrook and Hillfarm brands, that Bluebrook milk produced on March 20 was contaminated was not reason to suspect that the Hillfarm milk produced on March 30 was also contaminated. The consumer complaints received by Jewel were also not reason to suspect that products other than Bluebrook 2% milk produced on March 20 were contaminated. The IDPH and the CDC informed Jewel that complaints about other products should be expected because of consumer confusion, and there was expert testimony at trial that such complaints were not a reliable indicator of product contamination.

This evidence belies plaintiffs' contention that Jewel continued to market milk products with callous disregard for public safety, failed to obtain test results for milk produced after March 29, and should have known that Hillfarm 2% milk produced on March 30 was contaminated. Certainly, there is credible evidence which fairly tends to support the jury's verdict and thus there is no basis for setting the verdict aside.

## II

Plaintiffs maintain that defense counsel committed prejudicial error in his closing argument by using a "traffic analogy" to explain willful and wanton conduct; by misstating the scope of the pretrial agreement to pay compensatory damages by failing to explain that the agreement did not apply to members of the punitive class and others who opted out of the compensatory classes; and by expressing his personal opinions. Again, we disagree.

■ Attorneys are permitted wide latitude in closing argument. (*Bresland v. Ideal Roller & Graphics Co.* (1986), 150 Ill. App. 3d 445, 454, 501 N.E.2d 830.) Counsel may properly state what they believe the law to be (*Lounsbury v. Yorro* (1984), 124 Ill. App. 3d 745, 748, 464 N.E.2d 866), and may explain to the jury what each side believes

the evidence proves (*Patur v. Aetna Life & Casualty* (1980), 90 Ill. App. 3d 464, 470, 413 N.E.2d 65).

■■ A closing argument must be "clearly improper and prejudicial" to warrant reversal of the judgment. (*Boasiako v. Checker Taxi Co.* (1986), 140 Ill. App. 3d 210, 214, 488 N.E.2d 672.) A party may not claim error based on invited remarks (*Tzystuck v. Chicago Transit Authority* (1988), 124 Ill. 2d 226, 246, 529 N.E.2d 525), and errors not objected to at trial are deemed waived (*Daniels v. Standard Oil Realty Corp.* (1986), 145 Ill. App. 3d 363, 369, 495 N.E.2d 1019). In determining whether a party has been denied a fair trial because of the opposing party's closing argument, considerable deference is extended to the trial court's judgment, because the trial court is in a superior position to assess the accuracy and effect of counsel's statements. *Lawing v. Chicago Transit Authority* (1986), 142 Ill. App. 3d 119, 125, 491 N.E.2d 145.

■■ In this case, plaintiffs contend that defense counsel's use of a traffic analogy misrepresented to the jury that only intentional conduct rises to the level of willful and wanton conduct. Defense counsel had asked the jury several times during closing argument whether Jewel's conduct was like that of a motorist driving 75 miles per hour on a busy downtown street. The record shows, however, that defense counsel referred to the analogy as an "example" and the jury was instructed on the applicable law. Indeed, in denying plaintiffs' motion for a new trial, the trial court stated:

> "The closing argument did not represent to the jury that only intentional misconduct constitutes willful and wanton conduct. It was made clear to the jurors that [defense counsel's] comments concerning the operation of an automobile were solely for illustration and by way of analogy. This was done in the argument and by comments of the court. Furthermore, the jury was informed as to the law on this point by way of instructions."

On this record, it cannot be said that plaintiffs' case was prejudiced by defense counsel's use of the traffic analogy.

The cases relied on by plaintiffs on this point are all inapposite. In *Basden v. Kiefner Brothers, Inc.* (1980), 92 Ill. App. 3d 218, 414 N.E.2d 951, and *Noll v. Snap-on Tools Corp.* (1980), 89 Ill. App. 3d 1120, 412 N.E.2d 1185, counsel's remarks related to affirmative defenses that the trial court had earlier ruled were not relevant. There was no such attempt here to inject an irrelevant issue into the case. Rather, defense counsel's remarks concerned willful and wanton conduct, an issue properly before the jury.

Defense counsel's comments regarding the pretrial compensatory damages agreement were likewise not prejudicial and, in any event, were invited by plaintiffs' counsel's remarks. The record shows that defense counsel made remarks such as "[c]ompensatory damages will be paid" and "[t]hese persons who have been affected will be compensated in full" without explaining that not all persons in the punitive damages class were covered under the pretrial agreement. Plaintiffs admit that it was not improper for defense counsel to inform the jury that compensatory damages would be paid, but maintain that defense counsel's remarks misstated the scope of the compensatory damages agreement and thereby induced the jury to conclude that "justice and the public good" did not require the imposition of punitive damages, based on irrelevant compensatory damage considerations.

Plaintiffs' argument fails, however, because immediately following defense counsel's remarks, plaintiffs' counsel objected and the trial court heard argument outside the presence of the jury. The trial court then admonished the jury that Jewel "agreed to pay compensatory damages to make compensation to those people who are in what we will call the compensatory class." The trial court also instructed the jury that "[t]he amount of compensatory damages that will be paid is not an issue in this case." In denying plaintiffs' motion for a new trial, the trial court stated that "[d]efendants' final argument did not misstate to the jurors or mislead them as to whom compensatory damages would be paid *** They were made aware that compensatory damages and punitive awards were separate issues." Thus, there is no indication in the record that the jurors were confused about the distinction between compensatory or punitive damages or that they based their verdict on compensatory damages considerations. Plaintiffs' argument, that defense counsel's remarks necessarily prejudiced the jury because of "the incongruity between the verdict and the overwhelming evidence of defendants' conscious disregard for the safety of millions of people," is not persuasive, given that there is in fact ample support in the record for the jury's verdict.

In any event, defense counsel's remarks were invited by plaintiffs' counsel. Plaintiffs' counsel stated during closing argument that Jewel agreed to pay compensatory damages only after 1½ years of litigation, insinuating that Jewel initially refused to pay compensatory damages out of "corporate greed." Plaintiffs' counsel argued that punitive damages were appropriate in light of Jewel's manner in defending against the claims. Plaintiffs' counsel did not at that time make any distinction between the compensatory and punitive classes. Plaintiffs may not now claim error based on defense counsel's subsequent

remarks which likewise failed to distinguish between the compensatory punitive classes.

Finally, plaintiffs waived any objection to defense counsel's statements of his personal opinions by failing to object at trial. In any event, defense counsel's comments do not warrant reversal in this case. The statements "I simply do not believe from the bottom of my heart that there is any evidence of utter or reckless disregard" and "[w]e believe, all of us, 280,000 people who work for Jewel, that Jewel acted responsibly[,]" were based on the evidence. If, as plaintiffs maintain, the statement "I believe the mere utterance of the word is absolutely outrageous" referred to punitive damages, then that statement, even if improper, could not have substantially prejudiced the jurors, who were instructed that arguments of counsel are not evidence and that it is their responsibility alone to consider and weigh the evidence presented at trial.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

WHITE and McMORROW, JJ., concur.