Thomas **PAZDZIORA**, a minor, by Marjorie **PAZDZIORA**, his mother and natural guardian, Plaintiff,

v.

**SYNTEX LABORATORIES, INC.,** Pet, Inc., and Syntex (USA), Defendants.

No. 88 C 3622.

United States District Court, N.D. Illinois, E.D.

Aug. 20, 1991.

Charles L. Lowder, Bullaro, Carton & Stone, Chicago, Ill., J.B. Blumenstiel, Grieser, Schaffer, Blumenstiel and Slane, Columbus, Ohio, for plaintiff.

James Cunningham Murray, Jr., Laurence H. Lenz, Jr., Barbara J. Stuetzer, Katten, Muchin & Zavis, Chicago, Ill., for defendants.

MEMORANDUM AND ORDER

MORAN, Chief Judge.

Plaintiff, Marjorie Pazdziora, has brought the instant products liability claim on behalf of her son, Thomas Pazdziora, alleging that defendants' negligent manufacture of Neo–Mull–Soy, an infant formula, caused Thomas to suffer permanent physical and mental injuries, including speech and learning disabilities. In addition to compensatory damages, Pazdziora seeks punitive damages. Defendants, Syntex Laboratories, Inc., Pet, Inc., and Syntex (USA) (collectively, Syntex), have moved for summary judgment on Pazdziora's punitive damages claim. For the reasons set

forth herein, this court grants Syntex's motion.

## BACKGROUND

■ The following facts are undisputed.[1] In 1971, Syntex, a pharmaceutical company based in Palo Alto, California, acquired the Nutritional Products Division of Borden, Inc., which produced Neo–Mull–Soy and Cho–Free, soybean derivative formulas primarily intended for consumption by infants who were allergic to human breast milk or cow milk (Saperstein Aff. ¶¶ 3, 4). As part of the acquisition, Syntex obtained the right to produce Neo–Mull–Soy and Cho–Free, and acquired the Elgin, Illinois facility where these formulas were produced (Saperstein Aff. ¶ 3).[2] A number of Borden employees came to work for Syntex, including Sidney Saperstein, a microbiologist who had assisted in developing Neo–Mull–Soy and Cho–Free while with Borden (Saperstein Aff. ¶¶ 2, 3). Dr. Saperstein joined Syntex as a principal scientist, with primary responsibility for the infant formulas. Upon joining Syntex, he left the Elgin plant and moved to Syntex's corporate headquarters in Palo Alto (Saperstein Aff. ¶¶ 1, 3).

Because Neo–Mull–Soy is often consumed by infants for whom it is a total food source in the first four months of life (Saperstein Dep. Vol. I at 23), it must contain certain ingredients necessary for proper nutritional growth. Among these is chloride. A deficiency of chloride in an infant's diet can induce a condition known as metabolic alkalosis, indicated by fatigue and a lack of responsiveness. A severe chloride deficiency can result in slowed growth (Saperstein Dep. Vol I at 37–38, 48). In 1974, Dr. Saperstein set a target specification of 9.7 milliequivalents per liter for the chloride content of Neo–Mull–Soy (Saperstein Aff. ¶ 5).[3] At this time, he also requested that those responsible for quality control at the Elgin plant test Neo–Mull–Soy's chloride content on a weekly basis and inform him if the chloride levels, or those of any other element, failed to meet his specifications (Saperstein Aff. ¶ 5).[4]

In 1977, Syntex decided to substitute softened water for the deionized water that was currently being used in the production of Neo–Mull–Soy (Saperstein Dep. Vol. II at 26). Some time later Dr. Saperstein observed that the sodium level of the formula was on the increase, which he attributed to the new water type (Saperstein Aff. ¶ 6).[5] At the time, the Neo–Mull–Soy "reci-

---

1. At the outset, defendants correctly contend that plaintiffs have failed to conform to the requirements of this court's Local General Rule 12(n). Local Rule 12(n) requires in relevant part that a party opposing a summary judgment motion serve and file

   a concise response to the movant's [12(m)] statement. That response shall contain ... a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon.... Pursuant to Local Rule 12(n), all material facts set forth in a movant's statement "will be deemed admitted unless controverted by the statement of the opposing party." This court does not take lightly the procedural deficiencies of plaintiff's summary judgment response. Nonetheless, the significance of the substantive issues involved, coupled with the fact that nothing in plaintiff's version of the facts controverts that set forth by defendants, suggests that this court should exercise its discretion to decide defendants' motion on its merits rather than on a technicality. *See Bell, Boyd & Lloyd v. Tapy,* 896 F.2d 1101, 1103 (7th Cir.1990);

*Aetna Cas. & Sur. Co. v. Spancrete of Illinois, Inc.,* 726 F.Supp. 204, 206 (N.D.Ill.1989).

2. During all relevant time periods, Neo–Mull–Soy was also produced under contract by co-defendant Pet, Inc.

3. "Milliequivalent" is a chemical term used to describe the reaction of one component with another. In the case of Neo–Mull–Soy, it was obtained by taking the weight of the material in question and dividing that number by the material's atomic weight. Thus 35 milligrams of chloride, which has an atomic weight of 35, would be equal to one milliequivalent of that element (Saperstein Dep. Vol. I at 33–34).

4. Quality control in Elgin was also responsible for assaying the Neo–Mull–Soy produced under contract by Pet, Inc.

5. Water softeners tend to increase sodium levels (Saperstein Dep. Vol. II at 30–31). In hindsight, Dr. Saperstein now believes the increased sodium levels to have been caused by the soy protein isolate contained in the formula (Saperstein Aff. ¶ 6).

pe" called for adding 2.1 pounds of salt (sodium chloride) per 3300 pounds of formula. Dr. Saperstein calculated that removing this added salt would reduce sodium levels for the formula to the desired level. Coupled with a concern within the medical community over the potential dangers of excess sodium in the infant diet, this calculation led Dr. Saperstein to order the Elgin and Pet plants on March 23, 1978 to cease adding salt to Neo–Mull–Soy in the manufacturing process (Saperstein Aff. ¶ 7).

Although Neo–Mull–Soy contained chloride sources other than sodium chloride,[6] Dr. Saperstein's deletion order caused the chloride content of the formula to drop well below the target specification of 9.7 milliequivalents per liter (Saperstein Aff. ¶ 9). Syntex failed to detect these low chloride levels, however, because the two quality control personnel at the Elgin plant responsible for chloride testing each thought the other was conducting the weekly tests (Saperstein Aff. ¶ 9; Def. Interrog. Resp. 88). Although no one at Syntex's headquarters in Palo Alto, including Dr. Saperstein, or Syntex's plant in Elgin had ordered a halt to chloride testing, no chloride tests had been conducted on Neo–Mull–Soy since December 1977 (Saperstein Aff. ¶ 9).

On May 5, 1979, Dr. Neal Buist, of the University of Oregon Health Sciences Center, wrote Syntex, explaining that he was studying the electrolyte contents of infant formula (Ingram Aff. at ¶ 2). Although Dr. Buist's letter referred to no specific test results or instances of illness, it suggested that Neo–Mull–Soy had a low chloride content and inquired whether Syntex had received any reports of electrolyte disturbances (*Id.*). Dr. S. John Ingram, Syntex's Director of Medical Services, responded on May 30, 1979, informing Dr. Buist that Neo–Mull–Soy had a chloride content of 9.7 milliequivalents per liter and that

Syntex had received no reports of electrolyte disturbances in the ten years that the product had been on the market (Ingram Aff. ¶ 3).[7]

Just over one month later, on July 2, 1979, Dr. Stanley Hellerstein, M.D., of Kansas City, Missouri, called Dr. Saperstein to report that he had been treating an infant suffering from what "looked like" metabolic alkalosis and to inquire about Neo–Mull–Soy electrolyte levels (Saperstein Aff. ¶ 11). When Dr. Saperstein inquired whether Dr. Hellerstein believed the infant's illness was related to consumption of Neo–Mull–Soy, Dr. Hellerstein replied that he was uncertain but would continue his investigation (*Id.*). Dr. Saperstein requested that Dr. Hellerstein furnish him with the code numbers of the Neo–Mull–Soy the infant had ingested, so that the Elgin plant could conduct an electrolyte analysis (*Id.*).[8] Dr. Hellerstein, however, failed to provide the code numbers until several weeks later, after Syntex had recalled the product (*Id.*).

On July 24, 1979, Dr. Shane Roy, a pediatric kidney specialist from Memphis, Tennessee, attempted to speak with Dr. Ingram but was unable to reach him. Dr. Roy informed Dr. Ingram's assistant that he was treating three infants under six months old, all of whom were suffering from chloride deficiencies (Ingram Aff. ¶ 4). Dr. Ingram attempted to reach Dr. Roy later that day and the next, but was unable to reach him until July 26. In the interim, Dr. Ingram had written Dr. Roy to request additional information (*Id.*).

Dr. Ingram reported Dr. Roy's information to his supervisor, which resulted in a meeting of Syntex's Quality Assurance Advisory Committee on July 27. At this meeting, Dr. Ingram and Dr. Saperstein presented reports of illnesses that had been reported since July 24 (Ingram Aff. ¶ 5). As a result of the meeting, Syntex sent 25,000 mailgrams to pediatricians through-

---

**6.** Chloride was present in the soy protein isolate, three vitamins (B1, choline chloride, and pyridoxin), hydrochloric acid, and the basic mix water (Saperstein Aff. ¶ 8).

**7.** Dr. Ingram deemed Dr. Buist's letter to be unreliable because it overstated the chloride

content of breast milk by three times (Ingram Aff. ¶ 3).

**8.** Syntex retained a sample of each formula batch at the Elgin plant for such purposes (Saperstein Aff. ¶ 11).

out the United States, advising them of the reports and warning them to observe their patients carefully, and convened a blue ribbon panel in San Francisco to make additional recommendations (Ingram Aff. ¶¶ 5, 6). The panel, comprised of Syntex personnel, two physicians who had reported the most cases of chloride deficiency, a representative of the Centers for Disease Control, and a former chairman of the Committee on Nutrition of the American Academy of Pediatrics, met on August 1, 1979 (Ingram Aff. ¶ 6).

That evening, Syntex held an additional meeting of its personnel at its headquarters and decided to initiate an immediate product recall (Ingram Aff. ¶ 7). Syntex worked throughout the night and mailed out 25,000 mailgrams and 100,000 letters to physicians, nurses, and wholesalers the next day, August 2. Syntex sent an additional recall letter to every pediatrician and pediatric nephrologist in the United States on August 3 (Ingram Aff. ¶ 8). Finally, Syntex commissioned its sales force to remove all Neo–Mull–Soy and Cho–Free from store shelves, released news of the recall to the media, and contacted "thousands" of food brokers and "approximately 25,000" drug stores (Ingram Aff. ¶ 9).

On January 28, 1978, Marjorie Pazdziora gave birth to Thomas, who consumed Neo–Mull–Soy as his "near total" food source from February to November 1978 (Pazdziora Complaint ¶ 5). Alleging that Thomas has suffered permanent speech and learning disabilities as a result of ingesting Neo–Mull–Soy deficient in chloride, Marjorie Pazdziora filed the instant suit, in which she seeks compensatory and punitive damages on behalf of her son. Syntex now moves for summary judgment on Counts VII and XII of plaintiff's complaint, which comprise the punitive damages aspect of this suit.[9] It is to this motion that this court now turns.

9. Count VII seeks punitive damages against Syntex Laboratories, Inc. Count XII seeks punitive damages against Pet, Inc.

10. The Illinois General Assembly has expressed its reservations regarding punitive damages by permitting courts to enter a remittitur, grant a

## DISCUSSION

### A. *Summary Judgment Standard*

Before a court can grant a motion for summary judgment, it first must be satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). That *some* factual dispute exists will not defeat a properly supported summary judgment motion. *Whetstine v. Gates Rubber Co.*, 895 F.2d 388, 395 (7th Cir.1990). Although it is the court's obligation to view all evidence in the light most favorable to the non-movant, there will be no issue requiring a trial "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

### B. *Illinois' Punitive Damages Standard*

A motion for summary judgment must be assessed in light of the applicable substantive law. *Checkers, Simon & Rosner v. Lurie Corp.*, 864 F.2d 1338, 1344 (7th Cir.1988). Because of their penal nature, punitive damages are not favored under Illinois law and are allowed by the Illinois courts only within narrow limits.[10] *Deal v. Byford*, 127 Ill.2d 192, 203, 130 Ill.Dec. 200, 537 N.E.2d 267 (1989); *Kelsay v. Motorola, Inc.*, 74 Ill.2d 172, 23 Ill.Dec. 559, 384 N.E.2d 353 (1978). In Illinois, moreover, it is the trial judge who typically makes the initial decision as to the appropriateness of punitive damages under the circumstances. *J.I. Case Co. v. McCartin–McAuliffe Plumbing & Heating, Inc.*, 118 Ill.2d 447, 453, 114 Ill.Dec. 105, 516 N.E.2d 260 (1987). Illinois courts will permit the

conditional new trial, or apportion the award among the plaintiff, the plaintiff's attorney, and the Illinois Department of Rehabilitative Services in cases in which a jury awards punitive damages. Ill.Rev.Stat.1989, ch. 110, ¶ 2–1207.

imposition of punitive damages for torts "committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others." *Kelsay*, 74 Ill.2d at 186, 23 Ill.Dec. 559, 384 N.E.2d at 359.

The Illinois Supreme Court most recently articulated the standard for the imposition of punitive damages in *Loitz v. Remington Arms Co.*, 138 Ill.2d 404, 150 Ill.Dec. 510, 563 N.E.2d 397 (1990). In *Loitz*, the plaintiff successfully sought compensatory and punitive damages against Remington after the barrel of the shotgun he was using exploded, injuring his hand. At trial, the plaintiff sought to demonstrate that Remington had knowingly sold a defective shotgun by presenting evidence that Remington had received notice of 94 prior barrel explosions involving the model in question, that a plaintiff's expert had conveyed his safety concerns to Remington in a prior case, that Remington had changed its manufacturing process, and that Remington's own scientists had made potentially inculpatory remarks. Remington responded with evidence that it had investigated each reported barrel explosion and had concluded that each had been caused by the shells used rather than a failure of the gun itself and that its new manufacturing process had not affected the thickness of the gun barrels on the model in question. *Loitz*, 138 Ill.2d at 408–12, 150 Ill.Dec. 510, 563 N.E.2d at 399–401. Cautioning that the "willful and wanton" standard that constitutes the threshold for punitive damages is not the same as that for mere negligence, the *Loitz* court emphasized that punitive damages constitute an appropriate remedy only for

> "conduct involving some element of outrage similar to that usually found in crime. The conduct must be outrageous, either because the defendant's acts are done with an evil motive or because they are done with reckless indifference to the rights of others." (Restatement (Second) of Torts § 908, comment b, at 464–65

(1979).) In this context, willful and wanton misconduct "approaches the degree of moral blame attached to intentional harm, since the defendant deliberately inflicts a highly unreasonable risk of harm upon others in conscious disregard of it." *Bresland v. Ideal Roller & Graphics Co.* (1986), 150 Ill.App.3d 445, 457, 103 Ill.Dec. 513, 501 N.E.2d 830. *Loitz*, 138 Ill.2d at 415–16, 150 Ill.Dec. 510, 563 N.E.2d at 402. Applying this standard, and viewing the evidence in the light most favorable to the plaintiff,[11] the *Loitz* court overturned the jury's award of punitive damages.

C. *Syntex's Motion for Summary Judgment*

■ Syntex, through the affidavits of Drs. Saperstein and Ingram, contends that the undisputed facts establish that its conduct falls far below that required for the imposition of punitive damages under the *Loitz* standard. According to Syntex, it is undisputed that Dr. Saperstein issued his sodium chloride deletion order out of a concern for the health of infants consuming Neo–Mull–Soy (Saperstein Aff. ¶ 7); that he did so without knowledge that halting the addition of sodium chloride would result in the production of chloride-deficient formula (Saperstein Aff. ¶ 10); that no one in either Palo Alto or Elgin ever ordered that chloride testing cease and that no one in Syntex's Palo Alto headquarters was aware it had ceased (Saperstein Aff. ¶ 9); and that Syntex, once aware of Neo–Mull–Soy's chloride deficiency, acted promptly to warn pediatricians and consumers and recall the defective product from the market (Ingram Aff. ¶¶ 4–9).

Plaintiff presents four factors that purportedly demonstrate the existence of a genuine issue of material fact as to whether Syntex's corporate conduct merits the imposition of punitive damages: 1) that even before the sodium chloride deletion order of March 23, 1978, Syntex sold Neo–Mull–Soy despite knowing that Dr. Saperstein's 9.7 milliequivalent per liter target specification for chloride fell below that

---

**11.** *Loitz* involved an appeal from a jury's verdict in favor of the plaintiff.

recommended by the Committee on Nutrition of the American Academy of Pediatrics (Pl. Statement of Undisputed Facts at 10); 2) that Syntex wantonly and willfully sought to reduce Neo–Mull–Soy's sodium level solely to cut costs (*Id.* at 11); 3) that Syntex stopped testing for chloride from October 1977 to August 1979 (*Id.* at 15); and 4) that Syntex took no steps until August 1979 to warn its consumers that Neo–Mull–Soy was chloride deficient (*Id.* at 20). A review of plaintiff's summary judgment evidence in opposition to that submitted by Syntex, however, reveals no genuine issue of material fact as to the inappropriateness of punitive damages in this case.

Plaintiff first asserts that punitive damages are warranted because, even before the deletion of sodium chloride as an added element in Neo–Mull–Soy on March 23, 1978, Syntex was using a target level for chloride below that recommended by the American Academy of Pediatrics Committee on Nutrition. In 1976, the Committee recommended a chloride level in infant formulas of 10.4 milliequivalents per liter. In 1978 and 1979, the Committee proposed a chloride range of 11 to 29 milliequivalents per liter (Def. Interrog. Resp. 56).[12] It is undisputed that Dr. Saperstein selected the chloride target level of 9.7 milliequivalents per liter for Neo–Mull–Soy in 1974. Plaintiff, however, fails to dispute Syntex's summary judgment evidence, which establishes that the recommendations to which they refer were not issued until 1976 or later—at least two years *after* Syntex chose the 9.7 milliequivalent level—and that these recommendations were intended to apply to new products only. According to the deposition testimony of Dr. Saperstein,

> [the Committee on Nutrition's] recommendation at that time was to use 10.4 milliequivalents per liter in the *construction of new products. They knew there were other products on the market which did not have that amount. It was not a super critical amount,* but the election of 10.4 was in a sense one

out of the hat in that they needed a figure and some very old literature suggested that possibly the average amount in breast milk might be 10.4, so they used that figure ... they picked literature that was so old, we didn't know how accurate the data was, and there was no current real data on the composition of human milk.

(Saperstein Dep. Vol. I at 31–32). Plaintiff has offered no evidence that even remotely suggests that the 9.7 milliequivalents per liter target level for chloride utilized by Syntex—only .7 milliequivalents off the level recommended for new products two years later—posed a known danger to infants [13] or that, even if such were the case, Syntex chose or maintained this level in conscious disregard for that known danger. Nor does plaintiff offer any summary judgment evidence to dispute Dr. Saperstein's testimony that the Committee on Nutrition knew at the time of its 1976 recommendation that there existed products on the market with lower chloride levels. In short, plaintiff has submitted no evidence of a genuine issue of material fact in this regard.

Plaintiff next asserts that when Dr. Saperstein ordered that sodium chloride no longer be added to the Neo–Mull–Soy formula following Syntex's shift from deionized to softened water, he reduced the formula's chloride levels to near zero. This fact is undisputed; standing alone, however, it does not support plaintiff's claim for punitive damages. Perhaps aware of this, plaintiff offers evidence that Syntex's decision to change the nature of its water supply was motivated, at least in part, by the fact that the shift to softened water would save the company over $14,000 per year (Pl.Ex. 4; Saperstein Dep. Vol. II at 26–28). Plaintiff offers no evidence that Syntex made its decision to cut costs despite a known danger to the consuming public. More important, plaintiff presents no evidence that Syntex was motivated by

12. Such recommendations were not adopted by the Food and Drug Administration as regulations until 1979, after the Syntex recall (Saperstein Dep. Vol. I at 15).

13. The chloride levels found in the recalled formula were found to be far lower than Syntex's target specification (Ingram Dep. at 110).

cost considerations alone or, more important, that the cost considerations that contributed to Syntex's decision to change the water supply were in any way related to its decision to cease adding sodium chloride to the formula. It is the latter decision, rather than the decision to change the water component of Neo–Mull–Soy, that is relevant to defendants' motion.

With regard to the deletion order itself, plaintiff offers nothing to dispute Syntex's summary judgment evidence that it was motivated by Dr. Saperstein's legitimate desire to limit the sodium content of the infant diet in light of what was then a nationwide concern over the effects of excessive sodium on infants (Saperstein Aff. ¶ 7). Indeed, plaintiff's own evidence suggests nothing more than that, having selected an alternative water source that appeared to be causing the sodium content of Neo–Mull–Soy to rise, Dr. Saperstein made a good faith decision to stop adding salt to a product that he believed would contain excessive levels of sodium if he failed to act (Saperstein Dep. Vol I at 57, Vol. II at 30–31). Plaintiff offers nothing to contradict Dr. Saperstein's assertion that he never intended to remove chloride from the formula (Saperstein Dep. Vol. I at 50; Ingram Dep. at 140). Furthermore, plaintiff offers no evidence that Syntex deliberately elected to manufacture a formulation of Neo–Mull–Soy that it knew to be lacking an essential nutritional ingredient in order to save money. Plaintiff has submitted no evidence of conduct in this regard from which a reasonable juror could infer the "evil motive" or "reckless indifference" requisite for punitive damages under *Loitz*.

█ Plaintiff next asserts that Syntex's motion for summary judgment should be denied in light of the fact that the quality control sector at Syntex's Elgin plant, which was responsible for product testing, failed to test for chloride from October 1977 to August 1979. This fact is undisputed. Merely demonstrating that testing had ceased at the Elgin plant, however, is insufficient to merit the imposition of punitive damages. Under the "corporate complicity" doctrine followed by the Illinois courts, a corporation will not be held vicariously liable for its employees' actions for purposes of punitive damages unless "a superior officer of the corporation ordered, participated in, or ratified the 'outrageous conduct' of the employee." *Pendowski v. Patent Scaffolding Co.*, 89 Ill.App.3d 484, 488, 44 Ill.Dec. 544, 547, 411 N.E.2d 910, 913 (1st Dist.1980); *Tolle v. Interstate Systems Truck Lines, Inc.*, 42 Ill.App.3d 771, 772–74, 1 Ill.Dec. 437, 356 N.E.2d 625 (5th Dist.1976).

The undisputed evidence demonstrates no basis from which this court could infer that Dr. Saperstein, who was responsible for such matters within the company, "ordered, participated in, or ratified" the halting of chloride testing at the Elgin plant. Indeed, the evidence submitted by both sides to this litigation demonstrates a complete lack of knowledge on the part of Dr. Saperstein and, therefore, Syntex. It remains undisputed that Syntex's Elgin plant tested for chloride pursuant to Dr. Saperstein's orders prior to 1977 (Def. Statement of Undisputed Facts ¶¶ 5, 9; Plaintiff's Statement of Material Disputed Facts at 15–16). This, as defendants contend, becomes critical in light of additional undisputed evidence that this testing took place at Dr. Saperstein's direction, that he believed the testing to be continuing on a regular basis at the Elgin plant, that he never intended that his deletion order reduce chloride levels below the target level, and that he was depending on the quality control personnel in Elgin to let him know if tests revealed any deviations from the target specifications (as opposed to notification if those targets were being met) (Saperstein Aff. ¶¶ 5, 10).

Plaintiff, attempting to create an issue of fact as to whether Dr. Saperstein knew that testing had ceased in Elgin, submits documentary evidence that they claim demonstrates his repeated failure to respond "appropriately" to "pleas for help" from Elgin personnel regarding the target specifications for electrolytes in Neo–Mull–Soy (Pl. Exs. 15, 19, 45, 46). Review of these documents, coupled with plaintiff's excerpts of Dr. Saperstein's deposition testimony concerning them, indicates that they

offer no support for the imposition of punitive damages. Plaintiff, for example, offers a letter from Dick Riddle, manager of quality control at Elgin, in which Riddle indicated that he lacked the production manual for Neo–Mull–Soy as manufactured at the Pet, Inc. plant in Coldwater, and that he was particularly concerned with the procedure for *adding* (rather than deleting) sodium chloride (Pl.Ex. 15). Plaintiff's own deposition excerpts establish that Dr. Saperstein never received this memo (Saperstein Dep. Vol. II at 51–52); even if he had, it contains no reference to chloride *testing,* thus further diminishing its probative value for purposes of this motion. Similarly, plaintiff submits 1) a memorandum from Dr. Saperstein to Riddle, in which Dr. Saperstein responded to Riddle's inquiry as to the appropriate target figures for electrolytes according to the Neo–Mull–Soy production manual (Pl.Ex. 19); and 2) a follow-up memorandum from Riddle to Dr. Saperstein, inquiring whether the target figures could be met within a range of plus or minus ten percent, as in the pharmaceutical industry (Pl.Ex. 46). Plaintiff emphasizes certain passages from the latter memorandum, in which Riddle stated that he was not "knowledgeable regarding acceptable ranges of these electrolytes in relationship to the physiological health of infants. We need your help here." and "We need your help on all these matters and a prompt response regarding the implications of exceeding our present specifications for various microingredients...." (Pl.Ex. 45). As with plaintiff's other exhibits, these memoranda, which demonstrate Riddle's concern with the consequences of *exceeding* the target expectations for various ingredients, are in no way relevant to the issue of testing for chloride *deficiencies.* Plaintiff's claim that these documents evidence Dr. Saperstein's failure to respond "properly," moreover, are controverted by her own excerpts from his deposition, in which he testified that he "was on the phone with [Riddle] immediately" upon receipt of Riddle's request for assistance with the appropriate ranges (Saperstein Dep. Vol. II at 64).

In sum, not one of the plaintiff's documents regarding the halting of testing at the Elgin plant directly addressed the testing issue in any way. Dr. Saperstein has testified, and the evidence is undisputed, that at no point during his communications with Elgin did Dick Riddle indicate to him that the Elgin plant was not conducting chloride testing (Saperstein Dep. Vol. II at 64). Whether the communications from Elgin reasonably should have triggered an inquiry from Dr. Saperstein regarding the status of chloride testing at the plant—the issue pressed by plaintiff—is not for this court to decide at this juncture. The relevant issue in the context of Syntex's motion is whether plaintiff has submitted any evidence to indicate that Syntex produced and distributed Neo–Mull–Soy that it knew was not being tested, in conscious disregard of the known risk that would accompany such a practice. The undisputed evidence submitted by both sides to this litigation yields an unequivocal negative response to this question.

Finally, plaintiff contends that Syntex failed to warn the public of the dangers of ingesting chloride-deficient Neo–Mull–Soy. Plaintiff's assertion, however, is based in its entirety on Syntex's admission that it issued no warning of low chloride levels in Neo–Mull–Soy until it learned of them shortly before it recalled the product from the market (Def. Interrog. Response 52). Plaintiff fails, however, to cite any authority—indeed, this court doubts that any such authority could be found—for the proposition that a corporation's failure to take action to correct problems of which it is unaware merits the imposition of punitive damages. The undisputed evidence set forth in this court's background discussion, *supra,* indicates that Syntex implemented a decisive series of corrective measures immediately upon discovery that Neo–Mull–Soy was being produced in a chloride-deficient state. This assertion, as well, clearly fails to meet the standard set forth by the Illinois Supreme Court in *Loitz. See In re Salmonella Litigation,* 198 Ill.App.3d 809, 818, 144 Ill.Dec. 915, 921, 556 N.E.2d 593, 599 (1st Dist.), *app. denied,* 133 Ill.2d 557, 149 Ill.Dec. 337, 561 N.E.2d 707 (Ill.1990)

(jury verdict refusing to impose punitive damages upheld, where defendant, having received knowledge its milk was defective, recalled the product and investigated the cause of the defect).

## CONCLUSION

Defendants' motion for summary judgment on Counts VII and XII of plaintiff's complaint is granted.