GEORGE S. MAY INTERNATIONAL COMPANY, Plaintiff-Appellant, v. INTERNATIONAL PROFIT ASSOCIATES *et al.*, Defendants-Appellees.

First District (4th Division)   No. 1—92—1131

Opinion filed December 9, 1993.—Rehearing denied January 25, 1994.

Baker & McKenzie, of Chicago (Francis D. Morrissey, Michael A. Pollard, William Lynch Schaller, and John M. Murphy, of counsel), for appellant.

Ronald L. Bell & Associates, P.C., of Chicago, for appellees.

JUSTICE HOFFMAN delivered the opinion of the court:

This is an interlocutory appeal pursuant to Supreme Court Rule 307(a)(1) (134 Ill. 2d R. 307(a)(1)) from an order denying preliminary injunctive relief. Plaintiff, George S. May International (May), sought to enjoin several of its former employees from using alleged trade secrets and confidential information in a newly formed competing business, International Profit Associates (IPA), in violation of restrictive covenants. On appeal, May contends that the trial court erred in (1) determining that May's methods were not unique or sufficiently secret to warrant injunctive relief; (2) finding that defendants' restrictive covenants were geographically overly broad; (3) ruling that it was a defense for defendants to claim they returned May's alleg-

edly stolen property; and (4) disallowing certain impeachment evidence. We affirm.

May's initial verified complaint for injunctive relief was filed on October 24, 1991, along with an emergency motion for a temporary restraining order. Subsequent amendments were made, culminating in May's second-amended complaint for preliminary injunction. In that complaint, May alleged that it was in the business of providing consulting services primarily to small and medium-sized companies. May had furnished such services throughout the United States and Canada. Defendants were former May employees who had resigned from the company between August and October of 1991 and formed IPA, a competing management consulting firm. Defendant Tulio was IPA's president and defendants Burgess and Morton were IPA corporate officers.

May alleged that when it employed defendants, each had executed, as part of his or her employment contract, a restrictive covenant which included a confidentiality agreement. According to the complaint, each of the defendants' confidentiality agreements was substantially identical and provided in relevant part that each employee

"will not, while this agreement remains in effect, or at any time after his/her termination of employment:

(a) Directly or indirectly disclose, or in any manner reveal to any person, firm, association or corporation, any of the data, information, trade secrets or methods of doing business used or possessed by Employer, or any of the information, data or records of any client, obtained by or disclosed to Employee as a result of his/her employment by Employer [within a certain identified territory];

(b) Use or appropriate to his/her own use, without the prior consent of Employer, the distinctive business forms, programs, or equipment of Employer, or a reasonable facsimile thereof, which because of similarity in language, appearance, contents or for any other reason, may result in unfair competition to Employer."

The covenants also contained clauses barring former employees, for a period of six months from their date of termination, from directly or indirectly competing with May or directly or indirectly becoming employed by or rendering services to any entity that had been May's client during the year preceding the employee's termination. The agreements were restricted to certain geographic locations depending upon where the particular employee had worked.

May alleged that since September of 1991, when IPA commenced business, defendants had been misappropriating May's trade secrets

and confidential information that included "surveys, manuals, forms and [computer] programs." According to May, these materials comprised a unique system it had developed and refined, by which it economically analyzed the operations and structure of businesses, ascertained strengths or weaknesses, and then recommended and provided appropriate remedial services. May sought in relevant part to enjoin defendants from using or disseminating its alleged confidential information and/or trade secrets and from competing with May or becoming employed by its competitors.

On October 28, 1991, the court commenced a hearing on May's motion for a temporary restraining order, which it ultimately heard as a motion for preliminary injunction. The relevant evidence at the preliminary injunction hearing may be summarized as follows. May is comprised of three geographical divisions, one of which is the headquarters American division (HAM). HAM is based in Illinois and encompasses the area east of the Rocky Mountains, including Canadian provinces. All defendants worked in the HAM division in one of three departments: field services, survey services, and management services. Each of these departments performed one step of the three-tiered May "method" of providing consulting services.

Field services was essentially a sales division which conducted cold calls upon prospective clients within assigned territories and attempted to persuade them to undergo a diagnostic "survey" of their business at a cost of $350. Field service personnel were paid a commission for selling the survey service. During their employment with May, defendants Ferrell and Montross were in the field services department. Their restrictive covenants were limited to their respective territories, which in both Montross' and Ferrell's cases was the State of Michigan.

The survey was conducted by a member of the survey service department called an "executive analyst." The survey was an on-site, general analysis of the business' structure and financial operations, designed to determine which management services were necessary. The trial court observed that the survey was also essentially a promotional device intended to sell the customer on the need for May's management consulting services, the crux of its business. Survey service analysts were basically in a sales capacity; although May provided expense money for travel, the analyst received commission only if the prospective client enlisted May's management services. Prior to leaving May to join IPA, defendants Burgess, Morton and Tulio were executives in charge of the HAM survey service department. Although all three worked out of the HAM headquarters in Illinois, their restrictive covenants barred them from seeking

employment in the States of California, Florida, Illinois, New York and Texas. Several other defendants were survey service analysts, and their restrictive covenants encompassed the entire HAM division of 36 States, plus the Canadian provinces of Ontario and Quebec.

The third area of May's structure was the management services department. Management services personnel, called "staff executives," were dispatched to provide the client with corrective action based upon the information obtained by the executive analyst. Defendant Sharon Dunn was formerly in the management services department, and her restrictive covenant also encompassed the entire HAM district.

Edward Sielsky, managing director of HAM, testified extensively for May regarding what information and material it claimed to be proprietary. With regard to the field services department, Sielsky testified that all personnel underwent a three- to five-day training course in which they were taught May's particular sales presentation, including unique "hedging" techniques tailored to typical May prospects. These techniques were described in detail in May's "Field Service Manual of Policies and Procedures" (field manual). In addition to furnishing sales tips, the field manual addressed such concerns as employee travel expenses, promotion track and termination policies, and sales quotas and incentives. The introductory paragraph of the manual contained an admonition that the policies and procedures in the manual were May's property and trade secrets.

Sielsky admitted that the field manual contained much material that was commonly known and that he did not consider every item in it to be proprietary; however, Sielsky considered the manual "as a whole," along with its sales "hedges," to be part of May's method of business. Sielsky also acknowledged that the items in the field manual which were considered trade secrets were never identified as such to employees or trainees; rather, the determination of what was or was not a trade secret would be left to individual opinion or "common sense."

Sielsky further acknowledged that the field service manual was distributed to every trainee of the field service department to keep for the term of his or her employment. Sielsky testified that field service personnel were recruited continuously and that turnover in that department was very high: with 12 employees commencing employment and 12 terminating each week, there was a turnover of about 600 people annually. Trainees were allowed to take notes during their training and retain a copy for themselves. Sielsky could not say for certain whether Ferrell or Montross ever received copies of the field manual, and the record contains no evidence that they did.

Primary emphasis at trial was placed upon the "Survey Department Policy and Procedure Manual" (survey manual) and its included sample forms, which were utilized in training executive analysts to conduct surveys. Inscribed in the manual were provisions prohibiting reproduction and directing that its contents be kept confidential. It also provided for a charge-out fee of $100 to be assessed to any employee who failed to return the manual at the end of his employment.

Sielsky testified that the survey manual was disseminated freely to all trainees entering the survey department and that turnover in that department was very high. Analysts were recruited weekly and there were 13 training classes per year with 12 to 15 people per class. Further, although all trainees received allegedly confidential information during training, their employment agreements and restrictive covenants were not executed by May until after training was completed and May made the decision to employ the trainee.

In addition to a summary of May's history and philosophy, employee benefits, position descriptions and tips for attaining promotion, the survey manual and forms provided comprehensive guidance as to May's survey methods. Analysts who completed training and were employed by May were given enough sets of blank May forms at any one period to perform six surveys.

Sielsky testified that May's survey examined each particular business on several levels: structure, operation and financial standing. In the first phase of the survey, analysts utilized May's "opening questionnaire," a form containing 80 to 100 questions designed to elicit from the prospective client a quick understanding of its corporate format, organizational structure, and strengths and weaknesses in these areas. After then giving the prospective client a description of May's services, analysts distributed additional questionnaires to the client's employees to obtain their opinions as to areas of potential improvement. The analyst next toured the client's business and recorded his observations on another May form called an "opening call." Using this method, analysts were able to relay their findings systematically and expediently to May executive analysts as well as to the prospective client.

Sielsky then focused upon the financial phase of the survey. He repeatedly indicated that the main feature of May's method was that, through training and forms, it enabled analysts who typically were not well versed in accounting and financial applications to view sometimes technical data from a prospective client's files, select that which May considered relevant for its survey, and reclassify it in a simpler format so the analyst could then analyze it. The analyst would also apply allegedly unique ratios and pie charts developed by

May to "teach the client" how certain financial procedures could be improved. Sielsky identified four forms central to this process which were generally not found in the public domain: May's comparative balance sheet, comparative operating statement, optimal operating statement, and break-even chart.

Sielsky acknowledged that comparative balance sheets, comparative operating statements and break-even analyses in general were not unique concepts and were certainly in the public domain. He admitted that May's comparative balance sheet in several respects resembled one published by the Internal Revenue Service. However, Sielsky emphasized that May's version of these forms differed from others because May's were constructed to enable laymen to obtain a broad overview of financial status rather than undertake the usual highly specialized analysis. As an example of this, Sielsky pointed out that May's comparative operating statement broke down direct operating costs into only three categories: "labor" and "material" costs, which were important to May's operations analysis, and a third catchall category which combined all other direct costs. Distribution and administrative expenses were similarly reduced to three simple categories. Similarly, Sielsky indicated that May's break-even work sheet, which sought to obtain the point at which a company's total profits and costs were the same, was unique because it was a "rudimentary" process which allowed an analyst to arrive at a break-even calculation quickly and to coherently communicate his findings to the prospective client.

Sielsky testified that after executive analysts mastered the manual survey procedures, they were given portable Grid computers to use in performing the financial portion of the survey. Sielsky indicated that although May claimed no interest in the "Grid" trade name, May did originate the software or "firmware" used in the computer. According to Sielsky, the software was designed to conduct essentially the same analysis contained in the survey manual except with slightly more detailed ratio calculations. Sielsky testified, however, that the diskette used in the Grid computer was unusable unless it was used in the particular computer for which May formatted it. Further, the computer could not operate if the software was a copy of the original. Finally, the Grid computer disabled itself after a short time, and only May's mainframe computer could reenable it. Sielsky testified that, with the exception of Oviatt, all defendants had returned their Grid computers to May.

Allan Drebin, May's financial expert, reviewed May's survey manual and formulas and sample data produced using the Grid computer. Drebin believed that many of May's ratios were widely known

and published. However, he identified four aspects of May's survey that he described as "not generally used in business and not generally known": a ratio of current debt to inventory; the optimal operating statement; the particular break-even calculation; and the software used in the Grid computer, which contained the same material found in the survey manual. Drebin stated that, in doing a break-even analysis, a widely practiced calculation, accountants will usually spend a lot of time determining which costs are fixed and which are variable, a "key ingredient" to such analysis. May, on the other hand, lumped into one category those costs that were difficult to readily define as either fixed or variable, and simply treated half the category as fixed and half as variable. Finally, Drebin described the survey manual and May system "as a whole" as being unique.

Donald Fletcher, May's president, testified regarding the manuals used by the staff executives in installing the necessary remedial services. Known as "industry manuals," these were industry-specific, or tailored to particular kinds of businesses such as restaurants or construction. According to Fletcher, these manuals were made available only to the 150 to 220 employees in the management services department plus May executives. Industry manuals were subject to sign-out procedures as well as a sign-out fee in the event they were not returned. They also contained warnings forbidding copying.

Following arguments, the trial court entered an order denying May's preliminary injunction motion. May then filed the instant interlocutory appeal pursuant to Supreme Court Rule 307(a) (134 Ill. 2d R. 307(a)).

On appeal, May contends that its preliminary injunction motion should have been granted because it raised a fair question that the information in its manuals, its software, and its financial information were trade secrets or, at the very least, confidential information protectable under defendants' restrictive covenants.

■ A party seeking a preliminary injunction must prove a clear right or interest needing protection; no adequate remedy at law; irreparable harm if the injunction is not granted; and a reasonable likelihood of success on the merits. (*McRand, Inc. v. Van Beelen* (1985), 138 Ill. App. 3d 1045, 1050, 486 N.E.2d 1306.) Preliminary injunctive relief is intended merely to preserve the status quo until the court may reach the merits of the case; therefore, in ruling on such a motion, the court does not resolve controverted factual issues (*Dixon Association for Retarded Citizens v. Thompson* (1982), 91 Ill. 2d 518, 524, 440 N.E.2d 117), and a party seeking injunctive relief need only raise a "fair question" as to the existence of the right claimed. (*Buzz Barton & Associates, Inc. v. Giannone* (1985), 108 Ill.

2d 373, 382, 483 N.E.2d 1271.) The decision to grant or deny a preliminary injunction rests within the trial court's sound discretion, and our review is limited to examining the merits only as is necessary to determine whether the court's findings were against the manifest weight of the evidence. *McRand*, 138 Ill. App. 3d at 1050; *Lawter International, Inc. v. Carroll* (1983), 116 Ill. App. 3d 717, 451 N.E.2d 1338; *cf. Dixon*, 91 Ill. 2d at 525; *Preferred Meal Systems, Inc. v. Guse* (1990), 199 Ill. App. 3d 710, 557 N.E.2d 506.

■ A restrictive covenant that protects a legitimate business interest may be appropriately enforced through a preliminary injunction. (*PCx Corp. v. Ross* (1988), 168 Ill. App. 3d 1047, 522 N.E.2d 1333.) However, because such covenants operate as partial restraints of trade, they are scrutinized carefully by the courts and are unenforceable when their sole purpose is to inhibit competition. (*PCx*, 168 Ill. App. 3d at 1056; *Corroon & Black of Illinois, Inc. v. Magner* (1986), 145 Ill. App. 3d 151, 162, 494 N.E.2d 785.) An individual has a fundamental right to use his general knowledge and skills to pursue the occupation for which he is best suited. (*ILG Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 93, 273 N.E.2d 393.) Thus, the test for a valid restrictive covenant is whether it is reasonably necessary to protect the employer's legitimate business interests (*PCx*, 168 Ill. App. 3d 1047, 522 N.E.2d 1333), or to protect the employer from unfair competition, which is a determination turning upon the unique facts of each case. (*Hamer Holding Group, Inc. v. Elmore* (1990), 202 Ill. App. 3d 994, 560 N.E.2d 907; *Corroon & Black*, 145 Ill. App. 3d at 162.) Additionally, the plaintiff must show injury to its legitimate business interests separate and distinct from defendant's breach of the covenant. *Reinhardt Printing Co. v. Feld* (1986), 142 Ill. App. 3d 9, 15, 490 N.E.2d 1302.

May first urges that defendants' restrictive covenants be enforced because its material contained trade secrets. An employer's trade secrets are considered a protectable interest for a restrictive covenant under Illinois law. (*Callahan v. Balfour* (1989), 179 Ill. App. 3d 372, 534 N.E.2d 565; *Lawter*, 116 Ill. App. 3d 717, 451 N.E.2d 1338; Jager, Trade Secrets Law § IL.08(2), at 21-22 (1993).) The Illinois Trade Secrets Act (Act) provides as follows:

" 'Trade secret' means information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:

(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." Ill. Rev. Stat. 1991, ch. 140, par. 352(d).

Actual or threatened misappropriation may be enjoined. (Ill. Rev. Stat. 1991, ch. 140, par. 353(a).) The focus of both the common law and the Act is upon the secrecy of the information sought to be protected. (*Service Centers of Chicago, Inc. v. Minogue* (1989), 180 Ill. App. 3d 447, 453, 535 N.E.2d 1132.) The information must be sufficiently secret to impart economic value to both its owner and its competitors because of its relative secrecy. (*Hamer Holding*, 202 Ill. App. 3d at 1011.) Moreover, the purpose of the "economic value" requirement in the Act is " 'to preclude protection for information not generally known to the public but clearly understood in a particular industry.' " *Minogue*, 180 Ill. App. 3d at 454, quoting Jager, Trade Secrets Law § 3.04, at 3—34 (1988).

■ The supreme court adopted six factors as significant in determining the existence of a trade secret: (1) the extent to which the information is known outside the employer's business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken to guard the secrecy of the information; (4) the value of the information to him and his competitors; (5) the amount of effort or money expended by him in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *ILG Industries*, 49 Ill. 2d at 93; *Minogue*, 180 Ill. App. 3d at 453.

At trial, May emphasized not only that certain components of its manuals, financial formulas, and software were trade secrets, but also that its method as a whole was "unique" and not commonly used. Although compilations and methods may be trade secrets, it was incumbent upon May to show, as a preliminary requirement under section 2(d)(1) of the Act, that its information was secret enough to derive economic value because of that secrecy. This it failed to do.

■ It is undisputed that the field and survey service manuals, which contained the bulk of May's system and formulas, were routinely disseminated to thousands of incoming trainees before any confidentiality agreements were executed by May, and without regard to the extent of these individuals' commitment to May. Certain of May's allegedly confidential forms were apparently also given to or discussed with prospective clients. Although May purported to have sign-out policies and penalties for unreturned manuals, it is unclear how or whether these policies were enforced, given the vast number of people with daily access to the material. Finally and more

importantly, although May marked its manuals with broad admonitions regarding trade secrets, it never identified these secrets for its personnel despite the fact that the manuals also contained much material that May believed to be commonly known.

Nor did May present a fair question that its information was outside the "realm of general skills and knowledge." (*Minogue*, 180 Ill. App. 3d at 455.) Although Drebin characterized several of May's mathematical formulas as "not commonly known or used," there was no testimony that they could not readily be duplicated by anyone with some accounting or finance knowledge who sought to achieve ends similar to those of May. Likewise, there was absolutely no evidence that the sales techniques May claims were trade secrets were not known by the average salesman. Merely being the first or only one to use particular information does not in and of itself transform otherwise general knowledge into a trade secret. *Minogue*, 180 Ill. App. 3d at 455; see also *Hamer*, 202 Ill. App. 3d at 1011.

Under these circumstances, May cannot contend its information was secret within the meaning of section 2(b)(1) of the Act. Nor can it expect its transient work force to permanently keep secret the management consulting system in its entirety. As the supreme court observed in *ILG Industries*:

"Our society is extremely mobile and our free economy is based upon competition. One who has worked in a particular field cannot be compelled to erase from his mind all of the general skills, knowledge and expertise acquired through his experience. These skills are valuable to such employee in the market place for his services. Restraints cannot be lightly placed upon his right to compete in the area of his greatest worth." (*ILG Industries*, 49 Ill. 2d at 93-94.)

(See also *Samuel Bingham Co. v. Maron* (N.D. Ill. 1986), 651 F. Supp. 102, 106.) Accordingly, May has failed to raise a fair question that its information amounted to trade secrets.

May alternatively contends that even if its information did not constitute trade secrets, it was nonetheless protected as confidential information under defendants' restrictive covenants.

Generally, an employer has no proprietary interest in its clientele. However, such interest may be found for purposes of enforcing a restrictive covenant if the former employee acquired confidential information through his employment and subsequently attempted to use it for his own benefit. (*Reinhardt*, 142 Ill. App. 3d at 16; *Shapiro v. Regent Printing Co* (1989), 192 Ill. App. 3d 1005, 1010-11, 549 N.E.2d 793.) Assuming, *arguendo*, that we find May's information protectable under this standard, we concur with the trial

court's finding that defendants' restrictive covenants were too broad in geographic scope to be enforceable.

Restrictive covenants are valid if they are reasonable in temporal and geographic scope and extend as far as is reasonably necessary to protect the employer's legitimate business interests. (*Reinhardt*, 142 Ill. App. 3d at 15; *Samuel Bingham*, 651 F. Supp. at 105.) Covenants that are co-extensive with the employer's territory of business are normally held to be reasonable. (See, *e.g., Lawter*, 116 Ill. App. 3d 717, 451 N.E.2d 1338.) Although covenants without geographical restriction have been upheld, such covenants were typically limited in that they precluded only specific activities that jeopardized the employer's long-standing customer relations. (*Dryvit System, Inc. v. Rushing* (1985), 132 Ill. App. 3d 9, 13, 477 N.E.2d 35; *Samuel Bingham*, 651 F. Supp. at 105.) The rationale behind limiting geographic scope is that an employee should be excluded only from territory in which, because of his employment, he was able to establish a certain relationship with the employer's customers. *Lawter*, 116 Ill. App. 3d at 727.

■ May admits that this case involves no alleged long-standing client relationships or threatened misuse of client lists. (See *McRand*, 138 Ill. App. 3d 1045, 486 N.E.2d 1306.) The restrictive covenants in the instant case barred all defendants, most of whom were essentially salespersons, from "engaging in any business similar or competitive" to May's for a period of six months. The agreements also precluded the "direct or indirect" disclosure of any "information" learned while at May, in some cases for a six-month period, in most cases permanently. The covenants were not limited by activity and did not specify the type of information protected or the context in which it was barred from disclosure.

The covenants of defendants in the survey service department applied to 36 States plus two Canadian provinces. May's admitted reason for this broad restriction was that these employees were "assigned" or "could have been sent" to all areas east of the Rocky Mountains. However, the record shows that none of the individual defendants actually worked in all these States. Similarly, the covenants of Burgess, Morton and Tulio applied to Illinois, New York, Texas, California, and Florida, even though they had worked only in Illinois. Fletcher stated that remaining States were included because May might possibly expand into them. Finally, the field service defendants were barred from working in the respective States of their territory because this was where they could possibly call upon potential clients.

In light of the fact that May claims no established client relations in these areas, it is clear that defendants' covenants expanded

well beyond what is necessary to protect May's legitimate business interests. There are possibly millions of potential clients in May's market, and the covenants simply amount to an effort to restrict competition. Thus, the court did not abuse its discretion in refusing injunctive relief based upon these covenants. Because we find that the denial of injunctive relief was otherwise proper in this case, we do not reach May's next contention that the trial court improperly considered as a defense the fact that defendants had returned their Grid computers and manuals to May.

Finally, May argues that the court erred in refusing to allow rebuttal evidence of defendant Burgess' two prior convictions and disbarment.

■ As to the disbarment, there was no error. Specific acts of misconduct not resulting in a criminal conviction may not be used to impeach; this includes arrests, indictments, charges, or actual commissions of offenses. (*Knowles v. Panopoulos* (1977), 66 Ill. 2d 585, 363 N.E.2d 805.) The trial court properly observed that disbarment proceedings are not criminal proceedings and are subject to a lesser standard of proof, although it did take judicial notice of Burgess' disbarment. We find no error on this issue.

A witness' prior criminal conviction can be used in a civil suit to impeach his credibility if (1) the crime is punishable by death or imprisonment in excess of one year, or (2) the crime involved dishonesty or false statements, regardless of the punishment. (*Ryan v. Mobil Oil Corp.* (1987), 157 Ill. App. 3d 1069, 1082, 510 N.E.2d 1162.) In either case, the trial court must balance the probative value of the evidence against the danger of unfair prejudice and must not allow the evidence if the latter substantially outweighs the former.

In the instant case, one of the convictions did not involve false statements and had no probative value as to the charges alleged. The issue of the second conviction was apparently never properly placed before the trial court and was thus waived by May. In any event, our review of the record indicates any error on this point was harmless.

For the foregoing reasons, the order of the circuit court of Cook County is affirmed.

Affirmed.

CAHILL, P.J., and JOHNSON, J., concur.