MANGREN RESEARCH AND DEVEL-
OPMENT CORPORATION, Plain-
tiff–Appellee,

v.

NATIONAL CHEMICAL COMPANY, IN-
CORPORATED, and National Mold Re-
lease Company, Defendants–Appellants.

No. 95–1661.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 28, 1995.

Decided July 3, 1996.

Marshall L. Blankenship, James Adducci (argued), Schuyler, Roche & Zwirner, Chicago, IL, for Plaintiff–Appellee.

Paul J. Bargiel (argued), Chicago, IL, Michael J. Morrisroe, Carol Stream, IL, George A. Thomas, Thomas & Associates, Bloomingdale, IL, for Defendants–Appellants.

Before MANION, ROVNER, and EVANS, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

This diversity case involves a misappropriation claim under the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1 *et seq.* Mangren Research and Development Corporation ("Mangren") contends that defendants misappropriated its trade secrets in the course of developing and marketing a competing mold release agent. The claim was tried to a

jury, which found for Mangren and awarded $252,684.69 in compensatory damages and $505,369.38 in exemplary damages. The district court entered judgment on the jury's verdict and later denied defendants' renewed motion for judgment as a matter of law or for a new trial. The court also awarded Mangren its attorney's fees and costs. Defendants contend in this appeal that Mangren did not establish any protectable trade secrets under the Illinois statute, or that defendants had misappropriated any such secrets. They further argue that the jury's compensatory damage award is excessive and that there is no evidentiary basis for exemplary damages. For the reasons that follow, we reject defendants' arguments and affirm the judgment below.

## I.

### A.

Mangren's story is one of a grass-roots operation that made good. The company was founded in 1974 by Ted Blackman and Peter Lagergren while they were chemistry students at the University of Texas. Mangren initially manufactured dog shampoo and industrial cleaners and solvents in a garage that belonged to Blackman's father-in-law. Eventually, however, the company began to produce mold release agents. Rubber and plastics manufacturers apply such agents to the molds and presses they use in the manufacturing process. Typically, the end-product is formed by filling a mold or press with a liquified rubber or plastic and then heating, which causes the liquid to solidify and to take the shape of the vessel containing it. The mold release agent is designed to prevent the solidifying substance from sticking to the mold during this process.

In the mid–1970s, Masonite was a major user of mold release agents. At the time, Masonite was using a DuPont product called Vydax that was primarily composed of a flurotelemer (a type of fluorocarbon). Vydax was quite expensive, however, and Masonite asked Mangren to attempt to develop a

cheaper mold release agent that would be even more effective. Blackman and Lagergren then began to study and to experiment with different component chemicals. They decided that the key ingredient in their mold release agent would be a fluorocarbon resin that would impart a low surface energy to the molding surface. After eighteen months of study and testing, Mangren found that a particular type of polytetrafluoroethylene ("PTFE") performed this function. This type of PTFE had three essential characteristics: (1) it was highly degraded; (2) it had a low molecular weight; and (3) it had low tensile strength. At the time, PTFEs having these characteristics were used only as additives in manufacturing processes; they had never before been used as the primary component of a mold release agent. Indeed, the available literature indicated that this type of PTFE was unsuited for such an application.

Mangren first began selling a mold release agent that included TL–102, a highly degraded PTFE that had a low molecular weight and low tensile strength, in 1976. Before purchasing Mangren's product, Masonite tested it extensively to ensure its effectiveness. Masonite eventually approved the product and began using it with great success.

Once the formula was developed, Mangren's mold release agent was relatively inexpensive to produce.[1] Because the product was extremely valuable to Masonite, however, Mangren was able to price its product high and to earn a considerable profit. Indeed, Mangren's prices caused Masonite to investigate other potential suppliers and, at one point, even to attempt to develop its own mold release agent. Yet Masonite was unable to locate or to develop a mold release agent that could match the effectiveness of Mangren's product.

Having had considerable success selling to Masonite, Mangren decided to market its product to others as well. It first compiled a list of companies that produced molded rubber and plastic products. Yet, because not all of those manufacturers would have the

---

1. Over time, Mangren developed other formulations of its original mold release agent, but each utilized the same type of PTFE.

equipment necessary to use Mangren's mold release agent, the company contacted each one individually, explaining its product and the equipment needed to use it. In this way, Mangren developed a list of potential customers, but only after devoting a considerable amount of time and effort to the project.

Even as its sales grew, Mangren remained a small company, never having more than six employees at any one time. Because its success depended on the uniqueness of its mold release agent, Mangren took a number of steps to ensure that its formula remained secret. First, all employees were required to sign a confidentiality agreement, and non-employees were not permitted in the company's laboratory. Once chemical ingredients were delivered to the company's premises, moreover, the labels identifying those ingredients were removed and replaced with coded labels understood only by Mangren employees. The company's financial and other records also referred to ingredients only by their code names.

### B.

The seeds of the present lawsuit were planted when Mangren made two ill-fated hiring decisions in the 1980s. First, it hired Rhonda Allen in 1986 to be its office manager. Eventually, however, Allen became Mangren's sales manager, a position that provided her access to Mangren's customers and its pricing policies. In 1988, Mangren hired Larry Venable, an organic chemist, to help Blackman develop a chromium-free mold release agent. Although Venable did not have prior experience with PTFE-based mold release agents, he and Blackman succeeded in developing a chromium-free product that also used a highly degraded PTFE with low molecular weight and low tensile strength.

For reasons not relevant here, Mangren terminated the employment of Allen and Venable in 1989. After holding two intervening jobs, Venable met William Lerch early in 1990. Lerch had recently incorporated defendant National Chemical Company, Inc. ("National Chemical"), which was but one of a number of companies he then owned. Venable told Lerch about his Mangren experience and about an idea he had for developing a mold release agent to be used in the rubber industry. Lerch was excited about the prospect and inquired about the market for such a product. Venable responded that Masonite was a large user and therefore a potential customer.

The two discussed the possibility that they might be sued by Mangren if they developed a competing mold release agent. Venable was especially concerned because he realized that any product he could develop would be similar to Mangren's mold release agent. He knew, for example, that a mold release agent using TL–102—the PTFE that Mangren used—would be "potentially troublesome" and probably would prompt a lawsuit. Lerch told Venable not to worry about a misappropriation suit and explained that he had once been accused of trade secret infringement but had won the case by changing one ingredient or proportion of ingredients in creating his product. Lerch laughed and said the same thing would happen here. Shortly thereafter, Lerch and Venable incorporated defendant National Mold Release Company to manufacture the mold release agent that National Chemical would sell.

Venable then set about developing a mold release agent that would be more effective than Mangren's product. The agent he produced, like Mangren's, used a highly degraded PTFE that had a low molecular weight and low tensile strength. For the most part, Venable used a PTFE designated as TL–10, although he at times also used TL–102, the very same PTFE used by Mangren.

Venable then recommended that Lerch hire Allen to market defendants' product. Lerch knew that Allen, too, was a former Mangren employee. Defendants hired Allen as a vice president and assigned her the responsibility of developing a customer base for their mold release agent. From their days at Mangren, Venable and Allen knew that company's customers and pricing policies. Allen therefore approached Mangren customers with the news of defendants' new mold release agent and quoted a slightly lower price for defendants' product than that charged by Mangren. Allen contacted Masonite, for example, a company with whom

she had dealt on behalf of Mangren, and informed them about National Chemical and the mold release agent it had developed. Masonite expressed interest, and after at least one preliminary test and one control test, defendants were able to qualify their mold release agent for use at Masonite. Masonite then began purchasing defendants' product.

Venable and Allen left defendants in April 1991. Venable began to work as a consultant for Bash Corporation ("Bash"), a Chicago-based construction supply company. Venable provided Bash with a mold release agent formula that was substantially derived from defendants' formula. Allen, whom Bash had hired on Venable's recommendation, then presented Bash's product to Masonite as the same high quality product she had sold on behalf of National Chemical. Indeed, in a letter notifying Masonite of her association with Bash, Allen represented that:

> This change will not affect Masonite in any way, except for the better. You can still expect the same quality coatings and service I have provided you with in the past.... The only change will be in my company name and address. Even the names of the coatings will not change.

(Joint Ex. 21.) Because of its similarity to defendants' mold release agent, Bash was quickly able to qualify its product for use at Masonite and to begin selling to that company. Early in 1992, however, Bash went out of business, prompting Allen to incorporate Bash Chemical Corporation ("Bash Chemical") in Texas. That company then continued to manufacture and market the same mold release agent previously sold by the Illinois-based Bash.[2]

### C.

Mangren filed this suit in May 1993, after sales of its mold release agent markedly declined in the three previous years. Mangren alleged that defendants had misappropriated its mold release agent formula, and specifically its use of a highly degraded PTFE that had a low molecular weight and low tensile strength. Mangren also alleged the misappropriation of its customer list and

pricing information. Mangren sought to recover the profits it lost due to defendants' misappropriation, including profits lost through sales of PTFE-based mold release agents by defendants and Bash, and profits lost when Mangren lowered its prices to meet defendants' competition. *See* 765 ILCS 1065/4(a). The jury found for Mangren and awarded compensatory damages of $252,684.69. Because it found defendants' misappropriation to have been "willful and malicious," moreover, the jury awarded exemplary damages of $505,369.38, twice the compensatory damage award. *See* 765 ILCS 1065/4(b). The district court subsequently denied defendants' renewed motion for judgment as a matter of law (*see* Fed.R.Civ.P. 50(b)), as well as its motion for a new trial (*see* Fed.R.Civ.P. 59). Based on the jury's finding of a willful and malicious misappropriation, the district court awarded Mangren $113,426.50 in attorney's fees. *See* 765 ILCS 1065/5.

### II.

■ Defendants first contend that Mangren failed to establish at least one protectable trade secret under Illinois law. Even if it did, moreover, defendants argue that there was no misappropriation of that trade secret. In denying defendants' renewed motion for judgment as a matter of law or for a new trial, the district court found that the trial evidence was sufficient to support the jury's verdict. We review de novo the denial of defendants' renewed motion for judgment as a matter of law, but in doing so, we view the evidence in the light most favorable to Mangren and draw all reasonable inferences in its favor. *LaFollette v. Savage*, 63 F.3d 540, 543–44 (7th Cir.1995); *DeBiasio v. Illinois Cent. R.R.*, 52 F.3d 678, 682 (7th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1040, 134 L.Ed.2d 188 (1996). In this diversity case, we apply the federal standard for judgments as a matter of law, meaning that we will reverse only if no reasonable person could have found that Mangren established the challenged aspects of its claim. *Mayer v. Gary Partners and Co., Ltd.*, 29 F.3d 330,

---

**2.** We hereinafter refer to Bash Corporation and Bash Chemical Corporation jointly as "Bash."

335 (7th Cir.1994); Fed.R.Civ.P. 50(a). Our review of the district court's denial of the alternative motion for new trial is even more limited. As *LaFollette* explains, a new trial is warranted only "where the jury's verdict is against the weight of the evidence, and because that decision is committed to the district court's discretion, we will not disturb it except under exceptional circumstances showing a clear abuse of discretion." 63 F.3d at 543–44 (internal quotations and citations omitted).[3]

### A.

Under the ITSA, the term "trade secret" means

information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:

(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS 1065/2(d). This definition codifies two requirements for trade secret protection that had developed under the state's common law, both of which focus on the secrecy of the information sought to be protected. *See George S. May Int'l Co. v. International Profit Assoc.*, 256 Ill.App.3d 779, 195 Ill.Dec. 183, 189, 628 N.E.2d 647, 653 (1993); *Service Ctr. of Chicago, Inc. v. Minogue*, 180 Ill.App.3d 447, 129 Ill.Dec. 367, 371, 535 N.E.2d 1132, 1136 (1989); *see also Computer Care v. Service Sys. Enter., Inc.*, 982 F.2d 1063, 1072 (7th Cir.1992). Defen-

dants argue that Mangren failed to establish either element here.

Under the first statutory requirement, the information at issue "must be sufficiently secret to impart economic value to both its owner and its competitors because of its relative secrecy." *George S. May*, 195 Ill.Dec. at 189, 628 N.E.2d at 653. This requirement precludes trade secret protection for information generally known within an industry even if not to the public at large. *Id.; see also ILG Indus., Inc. v. Scott*, 49 Ill.2d 88, 273 N.E.2d 393, 396 (1971); *Minogue*, 129 Ill.Dec. at 371, 535 N.E.2d at 1136. A plaintiff like Mangren must prove that the real value of the information "lies in the fact that it is not generally known to others who could benefit [from] using it." *Minogue*, 129 Ill.Dec. at 371, 535 N.E.2d at 1136. The evidence in this case presents a textbook example of information satisfying this requirement.

When Mangren first embarked on its mission to develop for Masonite a more effective mold release agent, Masonite was purchasing a product from DuPont that employed a flurotelemer as its primary ingredient. After eighteen months of intensive research and testing, Blackman and Lagergren found that a particular type of PTFE (one that was highly degraded and that had a low molecular weight and low tensile strength) would make their mold release agent more effective and less expensive than that of DuPont. When they made this discovery, the prevailing view was that such a PTFE was unsuited for the type of application that Blackman and Lagergren envisioned. Thus, Mangren was the first to successfully use this particular type of PTFE in a mold release agent. Although defendants are quick to point out that "[m]erely being the first or only one to use particular information does not in and of

---

**3.** Although Mangren asserted below that defendants had misappropriated two distinct trade secrets—the formula for its mold release agent and its customer list and pricing information—the jury was not asked to make findings as to each but instead returned a general verdict in Mangren's favor. That verdict must be sustained if the evidence supports either aspect of Mangren's claim. *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265 (7th

Cir.1992) (citing *Griffin v. United States*, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991)). We therefore confine our discussion to whether the formula for Mangren's mold release agent was a trade secret and whether that secret was misappropriated by defendants. We express no opinion on whether the evidence also was sufficient to establish the customer list aspect of Mangren's claim.

itself transform otherwise general knowledge into a trade secret" (*George S. May*, 195 Ill.Dec. at 190, 628 N.E.2d at 654; *see also Minogue*, 129 Ill.Dec. at 372, 535 N.E.2d at 1137), there was sufficient evidence for the jury to conclude that Mangren was not using general knowledge at all. A reasonable jury could find instead that Mangren had developed a distinctive formula based on information not generally known or accepted within the industry.

Mangren proved, moreover, that secrecy imparted considerable economic value to its new formula. Although its mold release agent was relatively inexpensive to produce, Mangren was able to exact a substantial price because of the product's value to the customers who used it. Masonite, in fact, attempted to find another supplier and even to develop its own mold release agent at one point, but was unable to find or to develop an equally effective product. Mangren, then, clearly satisfied the first of the statute's two requirements for a trade secret.

Defendants nonetheless contend that Mangren did not satisfy the second, as it did not make a reasonable effort to maintain the secrecy of its formula. They argue, for example, that all of Mangren's employees (of which there were never more than six at a time) knew Mangren's formula, that an observer of Mangren's premises could identify the formula's ingredients because Mangren did not replace existing labels with coded labels until ingredients had been delivered, and that Mangren could not produce signed agreements from Venable or Allen promising to maintain the confidentiality of its formula.

■ Arrayed against these purported deficiencies, however, is considerable evidence that the company made substantial efforts to protect the secrecy of its formula. Although Mangren was unable to produce confidentiality agreements for Venable and Allen, it presented to the jury signed agreements for other Mangren employees. Blackman testified, moreover, that each employee (including Venable and Allen) was required to sign a confidentiality agreement and that employees were further advised of the secret status of the company's mold release agent formula. Lagergren added that only Mangren employees were permitted in the company's laboratory. Mangren also demonstrated that it regularly replaced identifying labels with coded labels once ingredients were delivered to its premises. Those ingredients were then referred to in Mangren's financial and other records only by their code names. Even if Mangren could have taken further protective measures just in case, as defendants suggest, a devious potential competitor were to stake out its premises and attempt to identify the chemicals delivered there, whether or not the actions Mangren actually took were sufficient to satisfy the ITSA's reasonableness standard was a question for the jury. *See Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 179–80 (7th Cir.1991). The evidence was certainly sufficient to enable reasonable jurors to conclude that Mangren made ample efforts to maintain the secrecy of its formula.

### B.

■ Having determined that Mangren established a protectable trade secret in its mold release agent formula, we turn to the question of misappropriation. The ITSA defines a "misappropriation" in pertinent part as follows:

[D]isclosure or use of a trade secret of a person without express or implied consent by another person who:

\* \* \* \* \* \*

(B) at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was:

(I) derived from or through a person who utilized improper means to acquire it:

(II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use. . . .

765 ILCS 1065/2(b)(2). Defendants argue that they did not "use" Mangren's trade secret under this definition because their mold release agent formula is not the same as

Mangren's. Although they concede that the primary ingredient of their formula is also a highly degraded PTFE with a low molecular weight and low tensile strength, defendants emphasize that many of the other ingredients are different. Furthermore, the specific PTFE used in defendants' product is typically not the same as the one used by Mangren, although its essential characteristics are identical. Finally, defendants use a slightly smaller volume of PTFE in their mold release agent—twenty as opposed to twenty-three percent in Mangren's product. These differences, in defendants' view, should have precluded the jury from finding that they misappropriated Mangren's formula.

■■■ Defendants' argument, however, is inconsistent even with the jury instruction to which they agreed below. The jury was instructed that:

In order for you to find that defendants misappropriated one of Mangren's trade secrets, you do not have to find that defendants copied or used each and every element of the trade secret. You may find that defendants misappropriated Mangren's trade secrets even if defendants created a new product if defendants could not have done so without use of Mangren's trade secret.

(Tr. at 781.) That instruction, as defendants apparently conceded below, is consistent with traditional trade secret law. We observed in

In re Innovative Constr. Sys., Inc., 793 F.2d 875, 887 (7th Cir.1986), for example, that "the user of another's trade secret is liable even if he uses it with modifications or improvements upon it effected by his own efforts, so long as the substance of the process used by the actor is derived from the other's secret." (Internal quotations omitted). Although that decision involved Wisconsin law, the law of Illinois is in accord. See Motorola, Inc. v. Computer Displays Int'l, Inc., 739 F.2d 1149, 1156 (7th Cir.1984); Northern Petrochemical Co. v. Tomlinson, 484 F.2d 1057, 1059 n. 2 (7th Cir.1973); Affiliated Hosp. Prod., Inc. v. Baldwin, 57 Ill.App.3d 800, 15 Ill.Dec. 528, 534, 373 N.E.2d 1000, 1006 (1978). We have observed before, in fact, that if trade secret law were not flexible enough to encompass modified or even new products that are substantially derived from the trade secret of another, the protections that law provides would be hollow indeed. Innovative Constr., 793 F.2d at 887; American Can Co. v. Mansukhani, 742 F.2d 314, 329 (7th Cir.1984).

Mangren emphasizes, moreover, that the trade secret misappropriated here was not necessarily its overall formula, but the essential secret ingredient—a highly degraded PTFE having a low molecular weight and low tensile strength, which had previously been considered unsuitable for such an application.[4] Defendants do not contest that they use a similar PTFE in their mold release

---

4. In their reply brief and again at oral argument, defendants stridently attacked this characterization of the trade secret:

Mangren's argument seems to be that no one (at least not Venable, Allen or [defendants]) may ever use a PTFE similar to the one used by Mangren in its mold release formula. Mangren says this notwithstanding the fact that Blackman himself testified that Mangren used at least three different PTFEs which have the necessary characteristics for the mold release Mangren produced, and that there are dozens more of such PTFEs commercially available. If one is to take Mangren's argument literally, no one can ever use a highly degraded, low molecular weight, low tensile strength PTFE in a mold release agent without violating Mangren's alleged trade secret. Although such a conclusion makes bad law as well as bad sense, it is where Mangren's argument necessarily leads.

(Def. Reply Br. at 8 (citation omitted).) This hyperbolic argument misses the mark. Mangren has never suggested that because it was the first

to develop a PTFE-based mold release agent, it has the exclusive right to produce and market such a product—as if it held a patent on the product, for example. Mangren would certainly have no claim for misappropriation if another company, after months of independent research and testing, developed a mold release agent using a similar PTFE. Under that scenario, of course, there would be no misappropriation at all because our hypothetical company would have developed its product in the same way that Mangren did—through its own ingenuity. See American Can, 742 F.2d at 329. But if, as Mangren proved to the jury's satisfaction in this case, the other company markets a PTFE-based mold release agent that it developed not through independent research and testing, but by using Mangren's trade secret, there was a misappropriation for which the law provides a remedy. See Pepsi-Co, Inc. v. Redmond, 54 F.3d 1262, 1270 (7th Cir.1995) (describing this scenario as "a traditional trade secret case"). That conclusion, which is actually where Mangren's argument leads, makes neither bad law nor bad sense.

agent and that it was Venable, the former Mangren employee, who revealed to them that such a PTFE could be used effectively. Once Venable let defendants in on the secret and defendants then used that secret to develop their own product, there plainly was a misappropriation even if defendants' product was not identical to Mangren's. In other words, reasonable jurors could conclude from the evidence in this case that defendants' mold release agent was substantially derived from Mangren's trade secret, for defendants could not have produced their product without using that secret. Defendants were not therefore entitled to judgment as a matter of law or to a new trial on the trade secret and misappropriation issues.

### III.

We turn then to the issue of damages. As we have explained, the jury awarded Mangren $252,684.69 in compensatory damages and $505,369.38 in exemplary damages. Defendants challenge only one aspect of the compensatory damage award, but contend that the entire exemplary damage award must go.

### A.

■■ Under the ITSA, a party proving trade secret misappropriation is entitled to recover the "actual loss caused by [the] misappropriation," as well as any unjust enrichment not taken into account in computing actual loss. 765 ILCS 1065/4(a). Mangren presented evidence at trial of the profits it lost on account of defendants' misappropriation, including profits lost when defendants and Bash sold their mold release agents to Masonite and others, and profits lost when Mangren lowered its prices to meet competition from defendants. The jury accepted Mangren's evidence, which included $133,417.99 in profits lost due to sales by Bash. Defendants do not dispute that Bash's sales represent lost profits to Mangren in that Mangren would have made those sales if Bash had not, but they contend that their misappropriation did not cause Bash to make the sales at issue—in other words, only Bash and not defendants can be held responsible for its own sales. In that regard, defendants emphasize that they have no interest in or other relationship to Bash, and that Bash in fact is one of their competitors in the mold release agent market. In denying a new trial on damages, the district court believed there was sufficient evidence to permit a reasonable jury to conclude that the Bash sales represented lost profits to Mangren that were caused by defendants' misappropriation.

By agreement of the parties below, the jury received the following instruction on compensatory damages:

> Damages can include both the actual loss caused by defendants' misappropriation and the unjust enrichment caused by defendants' misappropriation that is not taken into account in computing actual loss. Here, Mangren's actual loss would be the profit it would have made on the product it would have sold but for the defendants' misappropriation. The unjust enrichment would be the profits others made because of defendants' misappropriation.

(Tr. at 782.) Under this instruction, Mangren demonstrated to the jury's satisfaction that absent defendants' misappropriation, it would have made the sales ultimately made by Bash. Mangren proved, for example, that it was Venable who provided Bash with its mold release agent formula, a formula that Venable had developed in conjunction with Lerch while he was employed by defendants. Bash's mold release agent was substantially similar to and even carried the same name as defendants' product, which enabled Bash to quickly qualify its product for use at Masonite. Allen also represented to Masonite that Bash's product was the same as National's, and that only the company name had changed. A reasonable jury could conclude from this evidence that if defendants had not financed Venable's development of a mold release agent derived from Mangren's trade secret, and also had not supported Allen's subsequent effort to market that product to Mangren customers like Masonite, Bash would never have gotten its hands on Mangren's trade secret and would not have made the sales at issue here. A reasonable jury could therefore conclude that but for defendants' misappropriation, Mangren would

have made the disputed sales. The fact that defendants may not have personally benefitted from Bash's sales is not dispositive under the jury instruction so long as defendants' misappropriation was a "but for" cause of the third party's sales. The district court thus did not abuse its discretion in refusing to grant defendants a new trial on damages.

### B.

Defendants finally contend that the jury's award of exemplary damages is against the clear weight of the evidence and is otherwise excessive. The ITSA authorizes exemplary damages of up to twice the amount of compensatory damages if there was a "willful and malicious misappropriation." 765 ILCS 1065/4(b). Although we have found no Illinois case interpreting that phrase, it surely must include an intentional misappropriation as well as a misappropriation resulting from the conscious disregard of the rights of another. *Cf. Kelsay v. Motorola, Inc.,* 74 Ill.2d 172, 23 Ill.Dec. 559, 565, 384 N.E.2d 353, 359 (1978); *In re Salmonella Litig.,* 198 Ill.App.3d 809, 144 Ill.Dec. 915, 921, 556 N.E.2d 593, 599 (1990); *see also Wildlife Express Corp. v. Carol Wright Sales, Inc.,* 18 F.3d 502, 511 (7th Cir.1994) (discussing willful copyright infringements under 17 U.S.C. § 504(c)(2)). The jury found a willful and malicious misappropriation here and awarded exemplary damages to the full extent permitted under the statute.

To support that verdict, Mangren points to Venable's initial conversation with Lerch early in 1990. After Venable raised the possibility of developing a mold release agent for use in the rubber industry, he and Lerch discussed the fact that they might be sued by Mangren. As an officer of the defendant corporations, Lerch was aware of Venable's previous employment at Mangren and of his exposure there to Mangren's distinctive mold release agent formula. Venable realized, moreover, that any mold release agent formula he could develop would be similar to Mangren's. He indicated to Lerch, in fact, that a mold release agent using TL–102, the PTFE that Mangren used,

would be "potentially troublesome" and would likely prompt a lawsuit. Lerch seemed unconcerned, however. He told Venable that he had once been accused of trade secret infringement but that he had won the case because he had changed either one ingredient or the proportion of ingredients in creating his own product. Lerch laughed and said the same thing would happen here. The two then proceeded to incorporate defendant National Mold Release Company and to develop a mold release agent substantially derived from Mangren's trade secret.

Defendants insist that this discussion does not support a finding of willful and malicious misappropriation, but represents, in their view, a "sensible and ethical" way of dealing with "a potential problem." (Def. Br. at 47.) That seems to us an overly generous interpretation of Lerch's comments, and not one that the jury was obliged to accept. It was reasonable for the jury to conclude from this evidence that Lerch was not acting ethically at all, but that with an irreverent chuckle, he was authorizing the very misappropriation the jury found to have occurred. The last laugh belongs to Mangren, however, as we find the jury's award of exemplary damages to be supported by the weight of the trial evidence.[5]

### IV.

Because the trial evidence amply supports the jury's verdict, the district court properly denied defendants' renewed motion for judgment as a matter of law or for a new trial. The district court's judgment is therefore

AFFIRMED.

---

5. That conclusion also resolves defendants' challenge to the fee award under 765 ILCS 1065/5, as that section authorizes an award of fees where "willful and malicious misappropriation exists."