WARNER, C.J.
After obtaining a final judgment for damages and enjoining the appellee/cross-appellant, Predator Systems (“Predator”), from future misappropriation of Real Time Laboratories’ (“RTL”) trade secrets, RTL moved for the assessment of attorney’s fees on the ground that the misappropriation was willful and malicious. In addition, RTL moved for contempt for violation of the injunction. The trial court denied both motions. We affirm.
The instant case involves the manufacture and sale of “rate dampers” on Pave-way II and III laser-guided bomb systems. RTL, a defense contractor, designed these rate dampers exclusively for Texas Instruments (“TI”). After years of design and testing, RTL produced a rate damper in the 1970’s which met TI’s specifications. This rate damper was designed for the P II bomb and was the first of its kind. In the late 1970’s or early 1980’s, RTL began to design a neW-damper for the Paveway III bomb. The design also satisfied TI’s specifications. From 1983 to 1992, RTL was the first and only company to successfully design qualified rate dampers for the P III laser-guided bomb.
During this time, William Davis, Gordon Yowell, Gentry Ellis and Duane Samuelson headed the project. Each of them entered into an Employee Patent and Confidential Information Agreement with RTL, which noted that they had agreed not to disclose to anyone during or subsequent to employment, information not already available to the public relating to products, materials, sales methods, design, manufacturing process or business method. In February of 1988, Yowell, Davis and Samuelson all resigned from RTL. One week later they formed a new corporation called Predator Systems, Inc. Several months later Ellis also resigned from RTL and joined Predator’s engineering staff.
Because RTL was not able to meet TI’s production needs, TI approached Predator in 1991 regarding manufacturing a rate damper for the P III bomb. By 1991, TI awarded Predator a contract to build several units of the P III damper. In analyzing Predator’s qualifications, TI noted that Predator was “staffed by former engineers from Real-Time Labs.” When RTL discovered that Predator was manufacturing these bomb parts, it objected to Predator and later RTL filed suit against Predator asserting that Predator had misappropriated trade secrets relating to the rate dampers it produced. The complaint sought monetary damages and injunctive relief.
After a trial of the issues, the court found that Predator’s P III design was “substantially similar” to the existing RTL design, noting that the differences can be traced to the different, type of hydraulic *636 fluid. Most importantly, this change to RTL’s design required the relocation of a pathway leading from the chamber to the fluid reservoir to allow for expansion of the fluid when the unit was warmed. Thus, Predator had modified RTL’s original design. The court also found that Predator and its management were aware of RTL’s design and value, and that the company acted in “knowing disregard of RTL’s trade secret rights.” Furthermore, the court noted that “the obvious similarities between RTL and Predator designs' are not matters of coincidence.”
The trial court concluded that under section 688.002 of the Uniform Trade Secrets Act (“UTSA”) the defendants had breached the confidentiality agreement and relationship by misappropriating RTL’s trade secrets. In addition, despite the defendant’s claim that they altered, modified or improved RTL’s design, the court found that the user of another’s trade secret is liable, even if it is used with modification or improvement. Finally, the court found that Predator misappropriated RTL’s damper costs and pricing. The court awarded damages in the amount of the profits earned by Predator. It also provided for injunctive relief, requiring Predator to account to RTL for all of its profits from future sales of the P III damper and to pay them to RTL. However, although the court declined to enter an injunction to forbid Predator from making sales of the damper to TI, it did enjoin Predator from making sales to anyone else. Furthermore, the court ordered:
the defendants will each be further enjoined from any future misappropriation of RTL’s trade secrets, as through the utilization of any confidential information regarding the design and manufacture of any component for any weapons system designed or manufactured by RTL during any of the individual defendants’ tenures at RTL.
Predator appealed the final judgment, but the appeal was dismissed.

RTL’s Motion for Attorney’s Fees and contempt:

Soon after final judgment was entered RTL sought attorney’s fees under section 688.005 of the UTSA, which provides that fees may be awarded upon a showing that the misappropriation of trade secrets was “willful and malicious.” Around that same time, RTL learned that Predator had begun selling another rate damper, the Pave-way II, to TI. RTL moved to hold Predator in contempt of the injunction, asserting that Predator was violating the injunction by conspiring with TI to sell it Predator’s P II damper, which RTL alleged was essentially a smaller version of the P III damper design. At a later time, Predator filed a motion to modify or dissolve the injunction, arguing that there had been a change in circumstances and that there was no longer a commercial advantage to protecting the trade secret. The court set an evidentiary hearing on the motions, including RTL’s request for attorney’s fees.
At the hearing, RTL called no witnesses. Predator offered expert testimony that the P III damper design had become public knowledge and could be copied. In addition, the expert testified that the P II and the P III were not the same design, even though they did have some similarities. One former employee and one current employee of TI also testified similarly that the P II design had substantial differences from the P III. Based upon this evidence, the court denied the motion to hold Predator in contempt, concluding that the Predator’s P II damper design was sufficiently different from the P III, which had been found to be misappropriated.. Therefore, Predator had not violated the injunction.
With respect to the motion for attorney’s fees for obtaining the original injunction, the trial court did not find Predator’s actions to be malicious, which was required in order to award fees under section 688.005 of the UTSA. RTL has appealed both orders.

*637
Contempt:

RTL relies on Mangren Research and Development Corp. v. National Chemical Co., 87 F.3d 937, 943-44 (7th Cir.1996), to support its argument that the court misapplied the law in denying the motion for contempt. In analyzing the Illinois version of the UTSA, the court held that products need not be identical or copied to be misappropriated. See id. at 944 n. 4. Misappropriation can also be found where the evidence suggests that the defendants could not have produced their product without1 the use of the plaintiffs trade secret. See id. In Forest Laboratories, Inc. v. Pillsbury Co., 452 F.2d 621, 625 (7th Cir.1971), the court observed that “the user of another’s trade secret is liable even ‘if he uses it with modifications or improvements upon it effected by his own efforts,’ as long as the substance of the process used by the actor is derived from the other’s secret” (quoting Restatement of Torts § 757, comment (c), p. 9). RTL claims that under this standard Predator was in contempt because the P II it developed was merely a smaller version of the P III.
However, RTL’s problem in this appeal is an evidentiary one, not one of the legal standard to be applied. The trial court concluded that the two designs were not similar, which was RTL’s claim in its motion for contempt. Moreover, the expert disagreed with RTL’s contention that the P II was just a smaller version of the P III. Instead, he testified that the two rate dampers functioned in a substantially different way and were designed in accordance with different specifications, performance requirements, and parts. One of the TI employees testified that he believed that the P II was designed from scratch due to the configuration of the parts and the design itself. Although other parts of the testimony may have supported RTL’s claim, the trial court was the trier of fact and concluded on a fact basis that the P II was not similar, and no violation of the injunction occurred. The findings of the trial court are clothed with a presumption of correctness, and where there is substantial, competent evidence to sustain its actions, the appellate court cannot substitute its opinion on the evidence. See Smiley v. Greyhound Lines, Inc., 704 So.2d 204, 205 (Fla. 5th DCA 1998); Oceanic Int’l Corp. v. Lantana Boatyard, 402 So.2d 507, 511 (Fla. 4th DCA 1981). We find no error.

Attorney’s Fees:

Section 688.005, Florida Statutes (1995) provides, in pertinent part, that “[i]f ... willful and malicious misappropriation exists, the court may award reasonable attorney’s fees to the prevailing party.” (Emphasis supplied). RTL argues that “willful and malicious” requires only that the trade secrets were taken with “knowing or reckless disregard.” Predator not only disputes that standard but also, argues that in any event the court is given discretion whether to award fees even if it finds a willful and malicious misappropriation, and the trial court cannot be shown to have abused its discretion in denying the fee request under the facts of this case. Cf. Canakaris v. Canakaris, 382 So.2d 1197, 1203 (Fla.1980)(defining the abuse of discretion standard).
To support its position, RTL relies most strongly on two federal cases in which the appellate court affirmed the award of attorney’s fees by the district court. In Mangren Research, discussed supra, the court said that “[ajlthough we have found no Illinois case interpreting that phrase [willful and malicious], it surely must include an intentional misappropriation as well as a misappropriation resulting from the conscious disregard of the rights of another.” 87 F.3d at 946 (citations omitted). The conduct of the misappropriating parties in Mangren, however, was far more egregious than the facts present in this case. In Mangren, two employees who had been terminated from Mangren formed a new corporation with a third party to manufacture the same product that these employees had been in *638 volved with at Mangren. At the time the new corporation was formed, they discussed the fact that they might be sued by Mangren if they developed a competing product, but the third incorporator explained that he had once been sued for a trade Secret violation but had won the case by changing one ingredient in creating the new product. He laughed and said that the same would happen if Mangren sued them. The new corporation then set about to produce the new product and market it to Mangren’s largest customer.
In contrast, there was no testimony that the employees of RTL who incorporated Predator set out,to use RTL’s trade secrets to undermine its business. Predator was formed two years before any interest it had in the P III rate damper. It was only after RTL experienced production problems on the P III during the Gulf War that TI approached Predator about the possibility of Predator being a secondary source for the P III rate damper. Thus, even if the misappropriation could be considered by the court to be knowing, the court may have concluded that Predator did not set out to compete or to steal RTL’s main customer, as in Mangren.
In Boeing Co. v. Sierracin Corp., 108 Wash.2d 38, 738 P.2d 665 (1987), the trial court also awarded attorney’s fees in a trade secret misappropriation case, but again the facts are substantially different from those present here. Sierracin had manufactured plane windows for Boeing, using blueprints developed by Boeing. As part'of each contract Boeing signed with Sierracin, Boeing required it to agree not to use the drawings for any purpose other than exclusive Boeing manufacture. Sier-racin had signed more than 270 agreements with this provision. At some point, Boeing decided not to continue its relationship with Sierracin, but Sierracin decided to continue to manufacture the Boeing windows on its own for the “after market” (spare parts). Even though a Boeing official warned Sierracin against using Boeing’s drawings for this purpose, Sierracin ignored the warning and used the drawings to obtain its own authorization from the FAA to .manufacture these windows. On these facts, the trial court awarded attorneys fees finding that Sierracin knew its actions were of “dubious legality.” Id. at 680. “The trial court did not believe that Sierracin ever entertained any honest doubt as to the legality of its conduct, but took a calculated risk and lost.” Id. at 680-81.
In the instant case, while the Predator principals had agreed to non-disclosure requirements with RTL, they did not set out from the start to violate those agreements. There is evidence from which it could be concluded that Predator had a reason to believe that its design was not a violation of the policy, as TI had discussed the subject, and Predator had represented that neither the principals nor the corporation were concerned that it was violating the terms of its non-disclosure agreement.
In both Mangren and Boeing the appellate court affirmed the trial court’s findings and rulings. RTL has not pointed us to a similar case where the appellate court has reversed the denial of an attorney’s fee award. The statute gives the trial court discretion to award attorney’s fees even if the actions of the misappropriating parties is found to be willful and malicious. In this case, the trial court determined that the actions of Predator were not malicious and denied the attorney’s fees. The trial court’s finding is supported by competent, substantial evidence, and its denial of attorney’s fees cannot be said to be an abuse of discretion. Cf. Canakaris, 382 So.2d at 1203.
Predator cross-appeals the court’s denial of its motion to modify or dissolve the original injunction. First, as to its claims that it was vague and perpetual, those issues were waived by its failure to pursue them on direct appeal. See John *639 son v. Women’s Health Ctr., Inc., 714 So.2d 580, 584 (Fla. 5th DCA), rev. denied, 719 So.2d 893 (Fla.1998). Cf. Gilbertson v. Boggs, 743 So.2d 123, 126 (Fla. 4th DCA 1999). Second, the other claims of change of circumstances were based upon factual issues which the trial court resolved against Predator’s position. We therefore affirm the trial court’s denial of the motion.
Affirmed.
SHAHOOD and GROSS, JJ., concur.